# In the United States Court of Federal Claims

No. 23-2002

Filed: 7 January 2025

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| MICHAEL ENRIQUEZ, | \* |
|  | \* |
| Plaintiff, | \* |
|  | \* |
| v. | \* |
|  | \* |
| THE UNITED STATES, | \* |
|  | \* |
| Defendant. | \* |
|  | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Elizabeth M. Candelario*, with whom was *Kieran McDowell*, of Parlatore Law Group, both of Arlington, VA, for plaintiff.

*Delisa M. Sanchez*, Trial Attorney, with whom was *Steven J. Gillingham*, Assistant Director, *Patricia M. McCarthy*, Director, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Commercial Litigation Branch, Civil Division, Department of Justice, and *Carlos Andrés Pagán*, Navy, Litigation Attorney, General Litigation (Code 14), Office of the Judge Advocate General, all of Washington, DC, for the government.

## OPINION AND ORDER

**HOLTE, Judge.**

Plaintiff Michael Enriquez enlisted in the Navy in 1989 as a hospital corpsman. Throughout his thirty-two years of service, he was promoted several times and eventually achieved the rank of Captain, O-6, in March 2018. On 22 December 2020, following several complaints and an official investigation, a board of inquiry recommended plaintiff's separation from the Navy with his previous rank of Commander, O-5. The Board for Correction of Naval Records reviewed the board's decision and on 19 January 2023 issued a report recommending no corrective action. The Secretary of the Navy ultimately approved this decision and plaintiff was separated from the Navy. Before the Court now are the parties' cross-Motions for Judgment on the Administrative Record. Plaintiff alleges, for a variety of reasons, his separation from the military was improper because the Board for Correction of Naval Records allegedly acted arbitrarily, capriciously, and contrary to law and the weight of the evidence when recommending no corrective action. For the following reasons, the Court **GRANTS-IN-PART**, **DENIES-IN-PART**, and finds as **MOOT-IN-PART** plaintiff's Motion for Judgment on the Administrative Record and **GRANTS-IN-PART** and **DENIES-IN-PART** the government's Cross-Motion for Judgment on the Administrative Record.

I.     **Factual Background Related to the Investigation of and Administrative Proceedings Regarding Plaintiff's Alleged Improper Conduct**

In mid-2018, while plaintiff was a Captain in the United States Navy, he assumed command of the Field Medical Training Battalion-West at Camp Pendleton, California.  *See* AR at 287–88 (Fitness Report & Counseling Record for Field Medical Training Battalion-West); AR at 323 (History of Assignments).  In November 2019, an unidentified sailor under plaintiff's command filed an anonymous hotline complaint against plaintiff alleging plaintiff created a "toxic work environment," in addition to other allegations of improper conduct.  *See* AR at 617–19 (Anonymous Inspector General Complaint).  The Equal Opportunity Office evaluated the complaint, *see* AR at 613–16 (Equal Opportunity Advisor Complaint Analysis), and forwarded the sailor's allegations to Brigadier General ("BGen") Jason Morris, the Commanding General ("CG") of the Marine Corps Training Command ("MCTC"), for review, *see* AR at 606 (Appointment for Command Investigation).  In December 2019, MCTC initiated an investigation of the allegations involving interviews of "the individuals identified in the anonymous complaint."  *See id.*  The investigation "was completed on February 25, 2020" and recommended plaintiff "be relieved of command" and "appropriate administrative action" be taken "to document the substantiated allegations."  AR at 602 (Command Investigation).

BGen Morris, who is stationed "at Quantico, Virginia" and was in "command over Mr. Enriquez," 28 Aug. 2024 Oral Arg. Tr. ("Tr.") at 32:21–25, ECF No. 21, subsequently issued a final report substantiating allegations of harassment and bullying, removing plaintiff from his command position, and recommending plaintiff "be required to show cause for retention" in the Navy, *see* AR at 853–54 (Detachment for Cause) (containing Final Command Investigation Report as an enclosure).  BGen Morris's report, however, found all allegations of sexual harassment, retaliation, and ostracism unsubstantiated.  *See* AR at 855–57 (Final Report of Investigation).

On 1 April 2020, BGen Morris offered Mr. Enriquez non-judicial punishment ("NJP"), alleging three counts of violation of the Articles of the Uniform Code of Military Justice ("UCMJ").  *See* AR at 295–302 (Report and Disposition of Offense) (detailing the following charges:  (1) Article 92 – failure to obey a lawful general order; (2) Article 133 – conduct unbecoming an officer and gentleman; and (3) Article 134 – fraternization).  After plaintiff declined NJP and requested trial by court-martial, which he was legally entitled to, *see* AR at 299–302 (Nonjudicial Punishment Notification) (detailing plaintiff's election of rights and refusal of nonjudicial punishment), the CG sent a Report of Misconduct to the Board of Inquiry ("BOI") recommending plaintiff be required to show cause for retention, *see* AR at 291 (BGen Morris's Reply to Report of Misconduct).  On 30 April 2020, plaintiff responded to the CG's recommendation to show cause.  *See* AR at 292–94 (Plaintiff's Reply to Report of Misconduct).

On 31 July 2020, Navy Personnel Command sent a formal Notification of Administrative Show Cause Proceedings to plaintiff, but the notification was inadvertently sent to the incorrect region.  *See* AR at 457–58 (Notification of Administrative Show Cause Proceedings) (showing notification was sent to "Commander, Navy Region Mid-Atlantic").  On 24 November 2020, plaintiff finally received the Notification, which explained plaintiff was "ordered to show cause for retention in the Naval Service by Commander, Navy Personnel Command," AR at 864 (24 Nov. 2020 email to plaintiff) (attaching Notification of Administrative Show Cause Proceedings), based on misconduct in the form of:  three specifications of violation of UCMJ

Article 92 (failure to obey order or regulation); three specifications of violation of UCMJ Article 133 (conduct unbecoming an officer and gentleman); two specifications of violations of Article 134 (fraternization), and substandard performance of duty, *see* AR at 457–58 (Notification of Administrative Show Cause Proceedings). The email containing the Notification of Administrative Show Cause Proceeding also correctly changed the convening authority ("CA") location—the body responsible for overseeing the BOI, appointing its members, and making other evidentiary and administrative decisions during the proceedings—to Rear Admiral ("RDML") Bolivar, Commander, Navy Region Southwest. *See* AR at 863 (24 Nov. 2020 email from Lt Austin Short to LtCol Acosta) (explaining Notification of Administrative Show Cause proceedings was sent to the Mid-Atlantic Region by mistake and a "change of venue notice (attached, dated 23 Nov)" reassigned the matter to the correct region, the Southwest Region).

The BOI convened "at 0833 [on] 21 December 2020 at Navy Region Southwest, San Diego, California." *See* AR at 897 (Summarized BOI Tr.). The BOI included Senior Board Member RDML David Welch and Members RDML Timothy Weber and RDML Stuart Baker. *See id.* Although plaintiff's counsel, Lieutenant Colonel ("LtCol") Acosta, informed RDML Bolivar ahead of time he "anticipate[d] two days [were needed] to complete" the BOI, *see* AR at 444 (1 Dec. 2020 email from LtCol Acosta); *see also* AR at 438 (LtCol Acosta's 9 July 2022 Letter Regarding Plaintiff's Board for Correction of Naval Record ("BCNR") Petition), plaintiff's BOI hearing continued late into the night, with several witnesses not called to testify until 8:30–11:00 p.m., *see* AR at 428 (Plaintiff's Statement to the BCNR); AR at 359–60 (BCNR Review of Naval Record for plaintiff). As indicated to the parties prior to the scheduling of the BOI, "the goal will be to complete the board in one day" but "all should be prepared for this BOI to last more than one day if necessary" and "will proceed at the discretion of the Senior Member." AR at 866 (11 Dec. 2020 email from Lt Austin Short).

On 22 December 2020, the BOI issued its findings of fact recommending plaintiff "for separation" from the Navy under honorable conditions as a Commander, O-5. *See* AR at 913–14 (Summarized BOI Tr.); *see also* AR at 916–17 (BOI Report). The BOI concluded that the preponderance of evidence supported misconduct of the following specifications: (1) specification two of Article 92, UCMJ, violation of a lawful general order; (2) specification one of Article 133, UCMJ, conduct unbecoming an officer and gentleman; (3) specification two of Article 133, UCMJ, conduct unbecoming an officer and gentleman; and (4) specification two of Article 134, UCMJ, fraternization. *See* AR at 913–14 (Summarized BOI Tr.); *see also* AR at 916–17 (BOI Report). The BOI further found the preponderance of the evidence supported a substandard performance of duty. *See* AR at 914 (Summarized BOI Tr.); *see also* AR at 917 (BOI Report). The Board, however, found the preponderance of the evidence did not support the following specifications for misconduct: (1) specification one of Article 92, UCMJ, violation of a lawful general order; (2) specification three of Article 92, UCMJ, violation of a lawful general order; (3) specification three of Article 133, UCMJ, conduct unbecoming an officer and gentleman; and (4) specification one of Article 132, UCMJ, fraternization. *See* AR at 913–14 (Summarized BOI Tr.); *see also* AR at 916–17 (BOI Report). In response to the BOI decision, plaintiff alleged the BOI committed multiple legal errors and "request[ed] that the Secretary of the Navy return the case to a different [CA] for rehearing by a new Board," or alternatively, "disregard the findings and recommendations of the BOI members and retain [plaintiff] in the Naval Service or retire him in his current grade with an honorable characterization of service." *See* AR at 819–28 (Plaintiff's BOI Response).

On 23 January 2021, plaintiff challenged the results of the BOI by submitting a response. *See* AR at 819–28 (Plaintiff's BOI Response). Therein, plaintiff alleged the following errors: (1) unlawful command influence because the CA "twice met with [BOI] members" "outside the presence of [plaintiff] and Counsel for [plaintiff];" (2) RDML Weber, "a BOI member with extensive prior information about the case," was not excused from the BOI for cause; (3) the CA improperly did not "order[] the disclosure of all relevant communications about [plaintiff's] case in the possession of [RDML Weber] and his staff;" (4) the BOI's "recommendations regarding retirement grade" was not in accordance with procedure; (5) the BOI was allowed to "proceed despite insufficient notice to [plaintiff] of the specific alleged acts, omissions, or traits supporting the reasons for which" plaintiff was "being required to show cause for retention;" (6) "irrelevant, cumulative, incompetent, and immaterial evidence" was admitted before the BOI and "substantially prejudiced [plaintiff's] right to a fair hearing;" (7) plaintiff being "mandated" to "complete his case . . . in one day" resulted in plaintiff, plaintiff's counsel, and plaintiff's witnesses "to operate under time pressure and fatigue" which "substantially prejudiced [plaintiff's] right to a fair hearing;" (8) "the government exaggerated [plaintiff's] misconduct with orders that were not punitive at the time of the alleged actions;" and (9) the government's "evidence was insufficient to meet its burden by preponderance of the evidence." AR at 819–28 (Plaintiff's BOI Response). The Secretary of the Navy approved the BOI's recommendation on 19 October 2021. *See* AR at 371 (Plaintiff's Record Change Request). Plaintiff was officially discharged from the Navy as a Commander on 15 March 2022. *See* AR at 430–32 (Plaintiff's Discharge Form).

On 5 August 2022, plaintiff submitted a petition to the BCNR, asserting he was deprived of "his right to a fair and impartial hearing" as required by 10 U.S.C. § 1182(b), *see* AR at 395–96 (Plaintiff's Application for Correction of Military Record), and requested the "removal of any and all records pertaining to the BOI from [plaintiff's] records and his return to the rank of Captain for purposes of retirement benefits," *see* AR at 395–96 (Plaintiff's Application for Correction of Military Record).

On 22 August 2022, the Navy Personnel Command sent an advisory opinion to the BCNR concluding plaintiff "failed to provide any evidence that a material error or an injustice occurred" and recommended "his request for relief should be denied." *See* AR at 391 (OLC Advisory Opinion). The advisory opinion claimed: (1) although RDML Weber "had personal knowledge of [plaintiff's] being relieved of command," plaintiff failed to establish the personal knowledge created any injustice; (2) no evidence suggested the CA's private meetings with the BOI members had any non-social content and thus the meetings did not equate to any "unlawful command influence;" (3) no evidence suggested the Senior Member of the BOI conducting late-night proceedings was prejudicial to plaintiff or in violation of the rules; (4) the emails sent to and from RDML Weber were unrelated to the allegations against plaintiff, so the emails did not need to be disclosed, and because RDML Weber stated he could serve impartially, plaintiff experienced no injustice or material error related to RDML Weber's emails; (5) plaintiff was given adequate notice as plaintiff received the Detachment for Cause Request including eight of the Investigating Officer's opinions as well as the Investigating Officer's Final Report summarizing plaintiff's actions underlying the eight pieces of misconduct; (6) the BOI findings were unambiguous as each finding either "support[ed]" or "[did] not support" plaintiff's alleged misconduct, and plaintiff was given the BOI report before the deliberations and he made no official objection on the record; (7) plaintiff's retirement at the O-5 rank of Commander was

proper as he was a Captain for less than six months of satisfactory service; (8) while the BOI's Final Report included unsubstantiated claims, the unsubstantiated information did not affect the BOI's proceedings and the Legal Advisor appropriately considered plaintiff's argument; and (9) plaintiff's argument claiming the "cumulative effect of the errors create[d] an injustice" is meritless. *See* AR at 388–91 (OLC Advisory Opinion).

On 29 September 2022, plaintiff submitted a response to the advisory opinion in addition to his 5 August 2022 petition. *See* AR at 376–84 (Plaintiff's Further Statement in Response to Advisory Opinion). Plaintiff's response observed the Navy Personnel Command's advisory opinion is only one consideration of the BOI per SECNAVINST 5420.193, and the advisory opinion neglected to offer facts contradicting the evidence plaintiff provided. *See* AR at 376 (Plaintiff's Further Statement in Response to Advisory Opinion). Plaintiff claimed the opinion was flawed for several reasons: (1) RDML Weber's involvement as a BOI member constituted a procedural error because RDML Weber lacked impartiality, RDML Weber failed to mention his prior involvement in the case, the advisory opinion lacked substantiated evidence for some of the allegations against plaintiff and the opinion ignored witness statement evidence demonstrating RDML Weber's lacking impartiality;[1] (2) the convening authority's meetings with BOI members were "social" suggests the meetings were tainted with impropriety and, "[a]dditionally, the AO ignored [plaintiff]'s arguments" pertaining to the meeting's impropriety and unjustifiable retention of RDML Weber; (3) the advisory opinion did not consider plaintiff's evidence demonstrating the prejudice caused by the late night board proceedings; (4) the advisory opinion "misstated" caselaw relating to evidentiary requirements leading to the improper exclusion of RDML Weber's evidence; (5) RDML Weber's failure to disclose his emails constituted material error because when pressed, RDML Weber lied about his knowledge; (6) the Final Report only listed five substantiated findings, instead of the eight enumerated in the advisory opinion, and plaintiff "did not receive a copy of the [Final Report] until a few days before the BOI commenced"; (7) since the Final Report only listed "supports" or "does not support" next to the UCMJ specifications, the report failed to properly indicate what specific actions plaintiff took upon which the misconduct claims were based; (8) the advisory opinion did not consider the fitness reports plaintiff received while serving as an O-6 which demonstrates plaintiff's excellent ratings with more than six months of satisfactory performance contradicting the government's claim plaintiff did not perform six months or more of satisfactory performance at the O-6 rank; (9) doubt remains as to whether the BOI did not consider and was not impacted by the evidence improperly included as the government claims; (10) the advisory opinion fails to provide reasoning as to its conclusion plaintiff's cumulative-effect-of-the-errors argument is without merit and, relatedly, the advisory opinion ignores the BOI's prior decision finding multiple

---

[1] At oral argument, the Court asked the parties why certain areas in the administrative record—in particular plaintiff's witness letters—were redacted and whether this was standard practice in these types of cases, to which neither party could provide an answer. *See* Tr. at 120:10–20 ("[THE COURT:] The letters in this area, in the administrative record, all the plaintiff's witnesses are redacted. Is that standard for the AR in these cases? [PLAINTIFF:] I'm not sure if that's a standard thing to do or not, Your Honor, in all cases . . . . THE COURT: [The government]? [GOVERNMENT]: I don't know what the standard is."). The Court further inquired into who redacted the administrative record and the parties once again could not identify who was responsible for the redactions. *See* Tr. at 120:13–17 ("[THE COURT:] [D]id [plaintiff] redact them? [PLAINTIFF:] Oh, no, I did not redact that, no."); Tr. at 121:17–122:8 ("THE COURT: I'm just wondering . . . why the Navy redacted that. [GOVERNMENT:] I have no idea. THE COURT: Is that standard in other military cases like this? [GOVERNMENT:] I've not seen this, that I recall . . . . I can't tell you who did this, though, Your Honor. THE COURT: So the government doesn't know who redacted it either? [GOVERNMENT:] That's right.").

similar errors constituted a cumulative effect warranting relief. *See* AR at 376–84 (Plaintiff's Further Statement in Response to Advisory Opinion).

On 19 January 2023, the BCNR released its recommendation to not take corrective action on plaintiff's record. *See* AR at 339–65 (BCNR Review of Plaintiff's Naval Records). On 12 April 2023, the Secretary of the Navy approved the BCNR's recommendation. *See* AR at 366 (SECNAV Approval of BCNR Recommendation). The BCNR denied plaintiff's application and concluded plaintiff received "various levels of review" in a fair and impartial hearing and plaintiff was given "even more due process protections" than most individuals in BOI proceedings. *See* AR at 355–56 (Conclusion of BCNR Review). While the BCNR acknowledged it "did not know precisely what information . . . [RDML] Weber received about Petitioner's case," the BCNR concluded it "highly unlikely" RDML Weber received substantive information as RDML Weber's knowledge of the investigation was "limited" and he was likely not aware of other personal information related to plaintiff. *See* AR at 356 (BCNR Analysis of RDML Weber's Participation in the BOI). In response to plaintiff's claim RDML Weber made an "outright lie" when he represented he had no further contact with plaintiff besides "delivering a final fitness report," the BCNR depicted RDML Weber's response as "a misunderstanding on the part of the BOI member of the question posed by [plaintiff's] counsel" and depicted plaintiff's argument as "a rather transparent attempt to manufacture the appearance of bias and therefore disqualification of one of, if not the only Navy MSC officer senior in grade to Petitioner qualified to serve on the BOI." AR at 357 (BCNR Analysis of RDML Weber's Participation in the BOI). The BCNR determined even if RDML Weber knew substantive information, as the BOI decision was unanimous, RDML Weber's inclusion on the BOI would not have amounted to any harm to plaintiff. *See id.*

With respect to plaintiff's unlawful-command-influence ("UCI") claim, the BCNR determined "there was no evidence whatsoever in support" of UCI and the evidence only supported "the [CA]'s interactions with the BOI members was purely social in nature" and reflected "common courtesy that likely would be extended to any visiting flag officer, and [did] not provide any objective appearance of impropriety." *See* AR at 358–59 (BCNR Analysis of UCI). The BCNR concluded there was "no reason to believe that [CA Bolivar] had any personal interest in the outcome." *See* AR at 358–59 (BCNR Analysis of UCI). The BCNR claimed "the most logical and obvious reason that [RDML Weber,] was appointed to the BOI is that he was one of the few Navy" officers eligible to participate in the board due to his higher grade than plaintiff's grade. *See* AR at 359 (BCNR Analysis of UCI). The BCNR further argued there was no evidence the BOI was influenced by the CA and the private meetings held with the board members were social and to extend general thanks for their participation and, additionally, argued CA RDML Bolivar could not have influenced the BOI if she wanted to. *See id.*

The BCNR alleged the condensed one-day hearing timeframe did not inhibit plaintiff from receiving a fair hearing as the witness testimony was repetitive character witness testimony and if "the members tended to tune out the testimony of his witnesses, that would reflect [plaintiff's] own tactical error in presenting so many unnecessary witnesses." *See* AR at 359–60 (BCNR Analysis of One Day Hearing). The BCNR claimed plaintiff received the necessary, relevant communications he requested, thereby making plaintiff's discovery requests properly denied. *See* AR at 360 (BCNR Analysis of Discovery Requests). The BCNR argued the Notification of Administrative Show Cause Proceedings included sufficient specificity under SECTAVINST 1920.6D as it included specific factual allegations such as workplace harassment

and bullying of inferiors. *See* AR at 361–62 (BCNR Analysis of Notice). The BCNR concluded the BOI appropriately recommended an O-5 rank for plaintiff's retirement as six months of satisfactory service at the relevant grade is not a sufficient condition for retirement at this grade but is only a factor for consideration. *See* AR at 362–63 (BCNR Analysis of Plaintiff's Retirement Grade). The BCNR determined the legal advisor's choice to admit arguably incompetent evidence was reasonable and did not deprive plaintiff of a just proceeding as the experienced, high-ranked BOI members could evaluate the evidence for themselves. *See* AR at 363–64 (BCNR Analysis of Admitted Evidence). As to plaintiff's claims of "substantial injustices" at the BOI, the BCNR found: (1) the "CI to be very thorough and complete" and there was "no evidence to support [plaintiff's] contention that the CI lacked impartiality;" (2) plaintiff "was provided all of the process due to him, to include all that which he claims to have been denied" and plaintiff had the opportunity to refute all specific allegations during the BOI; and (3) plaintiff's "claims that the circumstances of his assignment after being relieved of command . . . demonstrated the obvious bias against and improper treatment" "simply [did] not constitute an injustice" because "[w]hile this may reflect an administrative error, it does not reflect an injustice" as "[i]t is not uncommon for officers to remain in an uncertain status while pending show cause proceedings" and "[t]his is a product of the uncertainty surrounding their future in the Navy, and not the result of an intent to further inconvenience or punish the officer." AR at 365 (BCNR Analysis of Substantial Injustices).

## II.    Procedural History

On 17 November 2023, plaintiff filed his Complaint in this court. *See* Compl. Plaintiff's Complaint alleges two counts: (1) "The BCNR's Decision is Arbitrary, Capricious, Contrary to Law, and Unsupported by Substantial Evidence"; and (2) "Mr. Enriquez was not Lawfully Separated as an O-5 and is Entitled to Retirement Pay as an O-6." *Id.* at 19–20. Both Counts re-allege and incorporate by reference the allegations plaintiff presented in the earlier portions of his Complaint. *See id.* Plaintiff alleges the BCNR was arbitrary, capricious, contrary to law and unsupported by substantial evidence based on the BCNR's following actions: (1) the BCNR's determination the BOI properly included RDML Weber and claimed, even if this inclusion was erroneous, the error would be harmless; (2) the BCNR concluded the BOI was not affected by Unlawful Command Influence; (3) the BCNR concluded the BOI did not deprive plaintiff of a fair and just hearing by the BOI placing the time constraint on plaintiff's proceedings, by admitting "irrelevant, cumulative, and immaterial evidence," by not providing proper notice with respect to the allegations, and by failing to recommend retirement grade; and (4) the BCNR neglected "to grant relief for cumulative effects" of the BOI's multiple mistakes. *See id.* Count II also alleges plaintiff is entitled to O-6 level retirement pay and was unlawfully separated as a Commander, O-5, by re-alleging and incorporating by reference the allegations in the prior sections of his Complaint. *See id.* at 20.

On 23 February 2024, the government filed the 840-page administrative record. *See* AR, ECF No. 6. On 26 March 2024, plaintiff filed a motion for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC") requesting the Court "vacate the decision of the Board for Correction of Naval Records and find that [plaintiff's] separation and rank reduction were unlawful, awarding him backpay due and retirement at the rank of O-6 . . . ." *See* Pl.'s MJAR; *see also* RCFC 52.1. On 14 May 2024, the government filed a cross-motion for judgment on the administrative record ("Gov't's Cross-

MJAR") and a response to plaintiff's MJAR.  *See* Gov't's Cross-MJAR, ECF No. 11.  On 4 June 2024, plaintiff filed his cross-MJAR and response to the government's MJAR.  *See* Pl.'s MJAR and Resp., ECF No. 12.  On 28 June 2024, the Court scheduled a status conference to be held on 24 July 2024.  *See* 28 June 2024 Status Conference Order, ECF No. 14.  On 12 July 2024, the government filed its Reply to plaintiff's 4 June 2024 filing.  *See* Gov't's Reply to Pl.'s MJAR, ECF No. 16.  On 24 July 2024, the Court held another status conference to discuss some of the parties' arguments involved in their respective motions for judgment on the administrative record and the oral argument schedule.  *See* 28 June 2024 Status Conference Order, ECF No. 14.  On 29 July 2024, the Court issued an order setting oral argument for 28 August 2024.  *See* 29 July 2024 Order, ECF No. 17.  The Court then held oral argument on 28 August 2024 in Nashville, Tennessee.  *See id.*

## III.    Parties' Arguments

Plaintiff argues the BCNR's decision to allow RDML Weber to serve on the BOI despite his personal knowledge of plaintiff's case was improper, arbitrary and capricious, and contrary to law.  *See* Pl.'s MJAR at 11.  Given the evidence of RDML Weber's personal knowledge making him ineligible to serve on the BOI, and the effect of the error on the BOI outcome unquantifiable, plaintiff argues the harmless error rule cannot apply to the BCNR's decision to nevertheless permit RDML Weber to sit on the BOI.  *See id.*  Further, plaintiff argues the BCNR arbitrarily and capriciously concluded there was no unlawful command influence in plaintiff's BOI proceedings.  *See id.* at 15.  Plaintiff urges the Court to find the BCNR also arbitrarily and capriciously erred in its conclusion plaintiff was not deprived of proper notice of the basis for his proposed removal prior to the BOI proceedings.  *See id.* at 23–24.  Plaintiff also challenges as arbitrary and capricious the BCNR's determination that the one-day BOI hearing—which lasted well into the night despite plaintiff's requests to reconvene the next day—was fair, despite plaintiff's alleged inability to properly present witness testimony within the condensed timeline.  *See id.* at 18.  Plaintiff further alleges the BOI proceedings were unfair as the CA did not provide him with all discoverable documents within the CA's custody and control.  *See id.* at 22.  Plaintiff additionally challenges the propriety of the command investigation as not impartial and not thorough.  *See id.* at 33.  Finally, plaintiff argues it was arbitrary and capricious for the BOI to determine plaintiff should retire at a lower paygrade of O-5 instead of as an O-6.  *See* Pl.'s MJAR at 28–30.

The government argues any knowledge of plaintiff's case on the part of RDML Weber was merely procedural and related to plaintiff's assignment, and thus RDML Weber's inclusion on the BOI was mere harmless error.  *See* Gov't's Cross-MJAR at 15.  The government agrees plaintiff was entitled to a fair hearing but argues plaintiff has offered no legal authority to support his claim of unlawful command influence as applicable within the BOI context.  *See id.* at 21.  The government argues plaintiff's notice argument must similarly fail, concluding plaintiff failed to identify in his MJAR any particular change or factual finding as to his removal that he was unaware of at the time of his BOI.  *See id.* at 24.  The government further argues the BOI hearing was proper because plaintiff was not deprived of the opportunity to present witness testimony and never formally objected to the length of the hearing.  *See id.* at 23.  According to the government, plaintiff was never deprived of relevant communications, and he should have requested the records he sought through a Freedom of Information Act ("FOIA") request.  *See id.*

The Court first reviews the applicability of the arbitrary and capricious standard of review as to plaintiff's allegations of unfairness at the BOI hearing and whether the BCNR's decisions were arbitrary and capricious. The Court then thoroughly reviews the factual record as it addresses each of the parties' arguments in turn.

## IV.    Arbitrary and Capricious Standard of Review

At oral argument, the parties agreed "the [C]ourt should review the BCNR's determinations under the arbitrary and capricious standard which permits the [C]ourt to set aside an agency determination if it's found to be arbitrary and capricious[,] an[] abuse of discretion[,] or not in accordance with the law [or] not supported by substantial evidence." Tr. at 6:2–7:8; *see also* Gov't's Cross-MJAR at 13 ("Under the APA, the Court upholds a military records-correction board's decision 'unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.'") (citing *Barnick v. United States*, 951 F.3d 1372, 1377 (Fed. Cir. 2010)); Pl.'s MJAR at 10 ("Pursuant to the Administrative Procedures Act . . . a reviewing court must 'hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."). Plaintiff therefore must establish the BCNR's decision to not order corrective action was "arbitrary, capricious, contrary to law, or unsupported by substantial evidence." *Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005) (explaining a court "will not disturb the decision of the corrections board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence" (citing *Haselrig v. United States*, 333 F.3d 1354, 1355 (Fed. Cir. 2003)); *see Carlborg v. United States*, 2024 WL 4675290 at *1 (Fed. Cir. 2024) (per curium) ("[W]e will not disturb the decision of the BCNR 'unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.'" (quoting *Chambers*, 417 F.3d at 1227)); *see also Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1983) ("[R]eview of the administrative decision [of military determinations] is limited to determining whether the action was arbitrary, capricious, or in bad faith, or unsupported by substantial evidence or contrary to law . . . .").

## V.    Whether the BCNR Arbitrarily and Capriciously Concluded There Was No Error in the BOI's Composition

Plaintiff claims the BCNR's decision to allow RDML Weber to serve on the BOI was improper, arbitrary and capricious, and contrary to law. According to plaintiff, RDML's personal knowledge of plaintiff's case made RDML Weber's participation on the BOI an improper composition problem, which thereby invalidated the BOI proceedings and contradicted related Court of Federal Claims cases. *See* Pl.'s MJAR at 11. Specifically, plaintiff relies on *Ricker v. United States*, 396 F.2d 454, 455–57 (Ct. Cl. 1968) and *Doyle v. United States*, 599 F.2d 984, 995–96 (Ct. Cl. 1979), to demonstrate personal knowledge can be a structural or compositional error which would render the BOI "fatally defective." *Id.* ("[Since] errors in board composition are violations of the plaintiff's right to fair procedure or process, they cannot be waived." (citing *Doyle*, 599 F.2d at 995–96)); *see Henderson v. United States*, Ct. Cl. 690 (Ct. Cl. 1966), *cert denied*, 386 U.S. 1016 (1967) ("When a military board is 'illegally constituted . . . in direct violation of the statutory mandate,' the proceedings are 'fatally defective.'"). At oral argument, the government agreed personal knowledge could be a structural or compositional error, as discussed in both *Ricker* and *Doyle*, which would render the BOI "fatally defective." *See* Tr. at 13:2–13, ECF No. 21 ("THE COURT:  So personal knowledge under SECNAV 1920

cannot ever been considered a structural error or it could in some instances? [GOVERNMENT]: I suppose it could."). Accordingly, the Court must analyze whether the BCNR acted arbitrarily and capriciously in concluding there was no error in the composition of plaintiff's BOI. The Court will first examine whether RDML Weber possessed personal knowledge of plaintiff and then analyze whether RDML Weber's participation in the BOI, despite his alleged personal knowledge, constituted harmless error.

### A.    Whether RDML Weber's Participation in the BOI Was Arbitrary and Capricious

Plaintiff avers RDML Weber was inappropriately appointed as a member of the BOI because he had personal knowledge of plaintiff's case, necessarily making the BCNR's decision to allow him to remain on the BOI arbitrary and capricious. Under SECNAV, "[o]fficers with personal knowledge pertaining to the respondent's case cannot be appointed to serve as a member of the Board considering the case." AR at 482 (SECNAVINST 1920.6D encl. (11), ¶ 7(f)). SECNAV sets out the procedure for mandatory removal of a BOI member upon discovery the member is improperly appointed:

> The Right to Challenge any Member for Cause. The respondent may submit for appropriate action any relevant matter which, in his or her view, indicates that a particular member or members should not consider the case. The [CA] must excuse a member if the member is found unable to render a fair and impartial decision in the respondent's case, as determined by a legal advisor or by the [CA] if a legal advisor has not been appointed.

AR at 485 (SECNAVINST 1920.6D encl. (11), ¶ 7(f)). If a BOI member is "found unable to render a fair and impartial decision," "the [CA] must excuse them." *Id.* The word "must" indicates a mandatory action and does not indicate a discretionary choice dependent on the judgement of the CA. SECNAV requirements also mandate an officer "with personal knowledge cannot be appointed." AR at 482 (SECNAVINST 1920.6D encl. (11), ¶ 3(f)). If the Court determines an officer with personal knowledge was improperly appointed to the BOI and the CA did not remove the officer, the CA would be acting in violation of the mandatory use of "must," as personal knowledge renders a Board member unable to participate in a fair and impartial decision. *See* AR at 485 (SECNAVINST 1920.6D encl. (11), ¶ 7(f)). In essence, if the CA acted in direct violation of a SECNAV mandate, then the BCNR's decision to ignore the CA's violation constitutes an "arbitrary" and "capricious decision" as it is "contrary to law." *Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005) (explaining a court "will not disturb the decision of the corrections board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence" (citing *Haselrig v. United States*, 333 F.3d 1354, 1355 (Fed. Cir. 2003)); *see Carlborg v. United States*, 2024 WL 4675290 at *1 (Fed. Cir. 2024) (per curium) ("[W]e will not disturb the decision of the BCNR 'unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.'" (quoting *Chambers*, 417 F.3d at 1227)).

The Court next comprehensively examines plaintiff's record support in arguing RDML Weber possessed personal knowledge of plaintiff's case. First, within his capacity as the director of the Medical Service Corps—of which plaintiff was a member—RDML Weber communicated about plaintiff with the Commanding Marine Corps General, BGen Morris, who initiated the

investigation into plaintiff.  *See* AR at 356 (BCNR Review of Plaintiff's Naval Record); *see also* AR at 840 (1513 8 Mar. 2020 Email from RDML Weber to BGen Morris) (introducing RDML Weber as "from Navy Medicine's regional command (Naval Medical Forces Pacific), located in San Diego, and Navy Medicine's Director of the Medical Service Corps").  During the pendency of plaintiff's case, RDML Weber was in the same geographic area as plaintiff.  *See* AR at 840 (1513 8 Mar. 2020 Email from RDML Weber to BGen Morris).  Given the geographic proximity of RDML Weber and plaintiff, RDML Weber was tasked by BGen Morris to "have control over" plaintiff while the Marine Corps conducted its investigation into plaintiff.  *See* Tr. at 33:21–34:3. During this time, RDML Weber received updates from BGen Morris about the Marine Corps investigation and BGen Morris's efforts to substantiate the allegations against plaintiff.  *See* AR at 837–41 (Email Chain Involving RDML Weber and BGen Morris).  BGen Morris informed RDML Weber plaintiff would be removed from command, and tasked RDML Weber with finding plaintiff a temporary assignment.  *See* AR at 837 (1235 8 March 2020 Email from BGen Morris to RDML Weber) (explaining BGen Morris's plan was to have plaintiff "check in for duty . . . with NavMed West/Pacific unless [RDML Weber] direct[ed] otherwise").  As RDML Weber communicated with BGen Morris about plaintiff, their communications transitioned from emails to text messages and included discussion of plaintiff and the investigation.  *See* AR at 837–41 (Email Chain Involving RDML Weber and BGen Morris) (referencing text messages in emails).  During one such conversation, RDML Weber assured BGen Morris he would continue to "have eyes on" plaintiff.  *See* AR at 838 (0941 8 March 2020 Email from RDML Weber to RDML Hancock who added BGen Morris) ("As mentioned in my text, it's important that we have eyes on [plaintiff] in the coming days.").  During the BOI voir dire, RDML Weber did not disclose he communicated with BGen Morris about plaintiff—either by email or text message. *See* AR at 437 (Letter from LtCol Acosta to the BCNR).  RDML Weber only later admitted to discussing plaintiff and the investigation with BGen Morris when plaintiff's counsel confronted RDML Weber with copies of the communications.  *See* AR at 437 (Letter from LtCol Acosta to the BCNR).  After outlining the above record support, plaintiff's counsel challenged the propriety of RDML Weber's participation on the BOI, arguing the totality of these facts constitute personal knowledge.  *See* AR at 437 (Letter from LtCol Acosta to the BCNR) (explaining LtCol Acosta challenged RDML Weber for cause on two grounds, arguing RDML Weber's prior knowledge and involvement in the case "undermined his ability to be fair and impartial").  The Court's analysis of RDML Weber's alleged personal knowledge addresses each of these facts in turn.

The Court first inquires into the relationship between plaintiff, RDML Weber, and BGen Morris.  Plaintiff first points the Court to RDML Weber serving as "the director of the Medical Service Corps" of which plaintiff was a member, indicating RDML Weber was generally aware of plaintiff.  *See* AR at 840 (1513 8 Mar. 2020 Email from RDML Weber to BGen Morris) (introducing RDML Weber as "from Navy Medicine's regional command (Naval Medical Forces Pacific").  While RDML Weber held this position, he "communicated with the Commanding General," BGen Morris—the individual "who initiated the investigation" into plaintiff—about plaintiff and the Marine Corps investigation.  *See* AR at 837–41 (Email Chain Involving RDML Weber and BGen Morris).  At this time, RDML Weber was located in San Diego, nearby plaintiff at Camp Pendleton when the Marine Corps investigation began, *see* Tr. at 32:21–25.  BGen Morris, however, was the Commanding General of a training command at Quantico, Virginia.  *See* Tr. at 32:21–23.  BGen Morris bridged this distance noting assistance from RDML Weber "to have control over" plaintiff given his geographic proximity to plaintiff

and knowledge plaintiff was under investigation. *See* Tr. at 33:21–34:3; *see also* AR at 837 (1235 8 March 2020 Email from BGen Morris to RDML Weber) (explaining BGen Morris's plan was to have plaintiff "check in for duty . . . with NavMed West/Pacific unless [RDML Weber] direct[ed] otherwise"); AR at 838 (0941 8 March 2020 Email from RDML Weber to RDML Hancock who added BGen Morris) ("As mentioned in my text, it's important that we have eyes on [plaintiff] in the coming days."). RDML Weber received further updates from BGen Morris about the investigation and BGen Morris's efforts to substantiate the allegations and remove plaintiff from command before plaintiff himself knew, *see* AR at 840 (8 Mar. 2020 Email from RDML Weber to BGen Morris) ("Obviously, [plaintiff]is unaware of this as of today and future assignment will be dependent on his current situation."), BGen Morris tasked RDML Weber with "finding [plaintiff] a temporary assignment," *see* AR at 840 (8 Mar. 2020 Email from RDML Weber to BGen Morris). After connecting these factual dots, plaintiff argues it is unreasonable to conclude RDML Weber lacked personal knowledge of plaintiff's case and BGen Morris's efforts to investigate plaintiff and remove plaintiff from his command. *See generally* Pl.'s MJAR at 12–16. The government disagrees, arguing these facts do not indicate RDML Weber knew about plaintiff's case or the circumstances surrounding plaintiff's allegations besides RDML Weber's "official knowledge regarding [plaintiff's] assignment and circumstances." *See* Gov't's Cross-MJAR at 15. Although the government agrees RDML Weber had "official knowledge" of plaintiff's circumstances, the government nevertheless argues the only knowledge RDML Weber had was plaintiff "had been relieved and was subject to removal, as every board member came to learn." *See id.* at 18–19. To conclude RDML Weber knew only of plaintiff's "assignment and circumstances" directly contradicts the record evidence RDML Weber not only knew about plaintiff's case and BGen Morris's investigation into plaintiff, but RDML Weber himself participated in "hav[ing] control over" plaintiff during the investigation, communicated with BGen Morris about plaintiff and the investigation, and personally assisted BGen Morris's efforts to remove plaintiff from his command as it was RDML Weber's responsibility to find plaintiff a "temporary assignment." *See supra*. Furthermore, RDML Weber's communications with BGen Morris about plaintiff seemingly only occurred in response to BGen Morris initiating an investigation into plaintiff, as the government agrees there was no previous engagement between RDML Weber and BGen Morris, and no other reason for them to communicate prior to the investigation. *See* Tr. at 36:18–22 ("THE COURT: So if [BGen] Morris and [RDML] Weber are not working together otherwise, then their engagement is purely related to [plaintiff], his transfer from a Marine Corps command to Navy in preparing for the BOI? [GOVERNMENT:] Yes."). The communications between RDML Weber and BGen Morris, as well as RDML Weber's tasks related to "hav[ing] control over" plaintiff and finding plaintiff a temporary assignment bolster plaintiff's claim RDML Weber had personal knowledge of plaintiff and the Marine Corps investigation within the meaning of the statute. *See* SECNAVINST 1920.6D encl. (11), ¶ 3(f) ("Officers with personal knowledge pertaining to the respondent's case cannot be appointed to serve as a member of the Board considering the case.").

The Court next examines plaintiff's record support of RDML Weber's personal knowledge of plaintiff's case stemming from the email and text message communications between BGen Morris and RDML Weber about plaintiff and the investigation into plaintiff. *See* AR at 898 (Summarized BOI Tr.); AR at 837–41 (Email Chain Involving RDML Weber and BGen Morris); AR at 437 (Letter from LtCol Acosta to the BCNR); *see also* Tr. at 33:21–34:3. RDML Weber acknowledged "he did have other interactions in [plaintiff's] investigation and

- 12 -

detachment for cause other than providing a final fitness report." AR at 898 (Summarized BOI Tr.). These communications "included updates from BGen Morris about the investigation" into plaintiff, *see* AR at 898 (Summarized BOI Tr.), and were in the form of emails which referenced text messages about plaintiff, *see* AR at 837–41 (Email Chain Involving RDML Weber and BGen Morris) (highlighting emails referencing text messages). In those communications, RDML Weber assured BGen Morris he would "have eyes on" plaintiff—and presumably did so as BGen Morris had tasked RDML Weber with looking after plaintiff given the pending investigation. *See* AR at 838 (0941 8 March 2020 Email from RDML Weber to RDML Hancock who added BGen Morris) ("As mentioned in my text, it's important that we have eyes on [plaintiff] in the coming days."). When pressed at oral argument as to the meaning of this statement, the government was unable to articulate what was meant by having RDML Weber "keep eyes on [plaintiff]." *See* Tr. at 58:1–16 ("THE COURT: What does that mean? [PLAINTIFF]: 'Having eyes on him?' I'm not entirely certain. I mean, I'm assuming that means, you know, they're watching him. THE COURT: [GOVERNMENT]? [GOVERNMENT]: It could have been a mental health thing. I mean, what [plaintiff] went through . . . during a very short period of time, half a year or so, was pretty cataclysmic. And I have no idea. There's nothing in the record that says it. When I first read it, I thought, as being a commander, being a supervisor, this . . . was possibly, you know, take care of your troops kind of a moment where they said he's in a bad way right now, we should just keep eyes on him, basically. I have no idea what else they might have meant."). As explained by the Court *supra*, given BGen Morris and RDML Weber did not have a pre-existing personal or professional relationship before BGen Morris notified RDML Weber of his investigation into plaintiff, there was no reason, excluding plaintiff's pending case, for BGen Morris and RDML Weber to be communicating, and RDML Weber's statement about needing to "have eyes on" plaintiff provides more factual context as to RDML Weber's personal knowledge of plaintiff, plaintiff's case, and the investigation into plaintiff. *See* AR at 898 (Summarized BOI Tr.); Tr. at 36:18–22. Additionally, the documentation RDML Weber and BGen Morris communicated via text messages rather than emails further adds context to RDML Weber's increasing "knowledge" of plaintiff's case. *See* AR at 837–41 (Email Chain Involving RDML Weber and BGen Morris) (highlighting emails referencing text messages). While the government attempted to characterize the text messages as a preferable, immediate form of communication, *see* Tr. at 38:17–23 ("THE COURT: [Why did BGen Morris and RDML Weber] all of a sudden transform their communications from email to also include texts? [GOVERNMENT:] For the same reason anybody might. So texts generally are sort of more immediate. You don't see paragraph-long texts."), the government could only *assume* the texts related to "procedural matters" and not to RDML Weber's personal knowledge of plaintiff's case, *see* Tr. 38:24–39:5 ("[GOVERNMENT:] They tend to be short, and so I assume they had to do just with just matters of immediacy like I'll get this to you tomorrow or whatever. So I don't [know] if they were significant, they probably would have been an email. But that's just my general knowledge of the relationship between texts as media and emails as a media and the way people use them generally."). The government's characterization of the texts, however, ignores the Court's question and (1) provides no explanation for the change in mode of communication and (2) the reality that switching mode of communication resulted in some written communication no longer retained in emails. *See generally* Tr. at 38:17–39:5. The government further undermines its argument the text messages were merely "nonsubstantive" as it offered nothing to rebut the fact the content of the messages encompassed allegations against plaintiff and BGen Morris's plans

- 13 -

to relieve plaintiff of his command. *See* Tr. at 42:12–19 ("[GOVERNMENT:] Texting is a means of quickly communicating short messages. At the time I assume . . . the admiral felt that was an effective way to communicate and, in fact, reflected sort of the nonsubstantive nature of the communication. Otherwise, he would have gone back to his office or into his office, sat down and started writing a text or an email."). Given the content of the messages, the correspondence between BGen Morris and RDML Weber indicates RDML Weber's knowledge of plaintiff's case and the pending investigation was not just mere "procedural knowledge," but rather, personal knowledge about plaintiff and his case. This is particularly true given RDML Weber was solely responsible for "keeping eyes" on plaintiff and was also tasked with relieving plaintiff of his command with a temporary assignment. *See* AR at 837–41 (Email Chain Involving RDML Weber and BGen Morris) (highlighting emails referencing text messages about how "it's important that we have eyes on [plaintiff] in the coming days"). This is the precise type of personal knowledge contemplated as impermissible under SECNAV 1920. *See* SECNAVINST 1920.6D encl. (11), ¶ 3(f) (detailing the requirements mandate an officer "with personal knowledge cannot be appointed").

The Court now turns to plaintiff's argument regarding RDML Weber's testimony before the BOI further bolstering a finding of RDML Weber having impermissible personal knowledge of plaintiff's case while participating in the BOI. During voir dire, when asked whether he had *any* prior interactions related to plaintiff's case, RDML Weber disclosed "his only interaction with [plaintiff] was as an intermediary when he delivered [plaintiff's] final fitness report on behalf of . . . [BGen] J. Morris"—omitting his history of communications with BGen Morris about plaintiff's case. *See* AR at 437 (Letter from LtCol Acosta to the BCNR). After this omission, RDML Weber did not promptly correct the record. Rather, RDML only disclosed the aforementioned communications with BGen Morris about plaintiff, when plaintiff's counsel, LtCol Acosta, confronted RDML Weber with the actual email communications:

> [LtCol Acosta] then confronted RDML Weber with emails provided to the Respondent[, plaintiff,] by the Recorder prior to the BOI and pursuant to SECNAVINST 1920.6D. These emails showed communications between RDML Weber, RDML Hancock and BGen Morris about the investigation into CDR Enriquez and BGen Morris' decision to relieve CDR Enriquez. Only then did RDML Weber state that he had additional communications with BGen Morris about the investigation into [plaintiff].

AR at 437 (Letter from LtCol Acosta to the BCNR). Plaintiff argues RDML Weber's "withholding of key responsive information, if not an outright lie, on *voir dire* further illustrates his lack of fairness and impartiality." Pl.'s MJAR at 5. At oral argument, the government agreed the Court and the parties cannot be certain as to why RDML Weber omitted this key information about his communications with BGen Morris because there is no transcript from the BOI proceedings. *See* Tr. 23:13–24:19 ("[THE COURT:] What good reason is there for [RDML] Weber to have left out what seems like a lot of additional communication regarding the case and [plaintiff]? [GOVERNMENT:] Well, I don't know what was in his state of mind. I don't know the exact question he was asked . . . . So I don't know what was going through Rear Admiral Weber's mind . . . . Again, I don't know exactly what he was asked."); Tr. at 21:11–13 ("[GOVERNMENT:] We don't have a transcript of what the actual questions were and what the

actual answers were."). The government also agreed RDML Weber was required to testify honestly, even though he neglected to disclose the communications until he was later confronted with the emails. *See* Tr. at 17:22–18:9 ("[THE COURT:] [V]oir dire must be part of the process and answered honestly? [GOVERNMENT:] [T]hey certainly have to testify honestly. There's no question about that."). The government acknowledged RDML Weber changed his voir dire answer as to the extent of his involvement in plaintiff's case, though the government declined to label RDML Weber a "liar" despite his inconsistent answers and conspicuous omission. *See* Tr. at 24:17–25:6 ("[GOVERNMENT:] So I'm just reticent to call him a liar or to say he should have answered differently when I don't know the question, but the record says what it says. [THE COURT:] Well, all we have is this paragraph [AR 388]. . . . So this paragraph, though, says 'Only interaction' was 'acting as intermediary for Brigadier General Morris.' But then after [being] confronted with documentation, he goes on to say [he] 'did have other interactions in the investigation and detachment for cause.' [GOVERNMENT:] That's what it says."). RDML Weber's flip-flopping answers and omission of his involvement in plaintiff's case further supports RDML Weber likely did not "misunderstand the question," but rather, chose to be less than forthcoming in his testimony. As there is no transcript of the BOI proceedings, the Court cannot determine the exact questions asked of RDML Weber and the government offered only assumptions to justify RDML Weber's omission and inconsistent testimony. *See supra.* The BOI transcript records indicating RDML Weber did not fully disclose the extent and frequency of his communications with BGen Morris regarding plaintiff's case further indicates RDML Weber likely possessed personal knowledge of plaintiff's case which may have resulted in RDML Weber's ineligibility for the BOI. *See* SECNAVINST 1920.6D encl. (11), ¶ 3(f) (detailing the requirements mandate an officer "with personal knowledge cannot be appointed").

After detailing the written evidence supporting RDML Weber's personal knowledge at the BOI, plaintiff's counsel, LtCol Acosta, "challenged RDML Weber for cause on two grounds: first that RDML Weber was not forthcoming during voir dire and that RDML Weber had prior knowledge about the investigation and was involved in assisting with [plaintiff's] relief" and "second, that RDML Weber had knowledge and influence upon the billets in which [plaintiff] would potentially serve if he was retained," both of which "undermined [RDML Weber's] ability to be fair and impartial." *See* AR at 437–38 (Letter from LtCol Acosta to the BCNR). After LtCol Acosta challenged RDML Weber for cause, the "[BOI recessed at 0905 to contact the legal advisor" and LtCol Acosta explained to the Legal Advisor that RDML Weber changed his answers about his involvement in plaintiff's case and about his communications with BGen Morris. *See* AR at 898 (Summarized BOI Tr.). "The Recorder [then] presented [LtCol Acosta's] arguments to the Legal Advisor and the Legal Advisor overruled [LtCol Acosta's] challenge for cause" and "determined that the Convening Authority had [the] final say." AR at 898 (Summarized BOI Tr.). The "[BOI reconvened at 0934 for presentation of evidence" while "the Legal Advisor contacted the Convening Authority" for the ultimate decision. AR at 898 (Summarized BOI Tr.). Plaintiff's challenge was ultimately denied without explanation or analysis. *See* AR at 438 (LtCol Acosta's Letter to the BCNR); *see also* AR at 898 (Summarized BOI Tr.).

On appeal to the BCNR, plaintiff once again argued RDML Weber was improperly appointed to the BOI. *See* AR at 898 (Summarized BOI Tr.). The BCNR sought advice from the Office of Legal Counsel ("OLC") for an Advisory Opinion ("AO") regarding RDML Weber's personal knowledge. *See* AR at 388 (OLC Advisory Opinion). Consistent with the factual support for finding personal knowledge, the OLC's AO found RDML Weber "*had personal knowledge* of [plaintiff] being relieved of command." *Id.* Despite the OLC finding "personal knowledge," the BCNR confoundedly concluded the BOI did "not know precisely what information that this BOI member received about [plaintiff's] case, but finds it is highly unlikely that he received substantive information." AR at 356 (BCNR Analysis of RDML Weber's Participation in the BOI) (emphasis added). The BCNR's opinion reasoned since RDML Weber "was the Director of the Navy MSC, of which [plaintiff] was a member, it is reasonable to believe that he would receive updates regarding such an investigation" and the "awareness of the progress of an investigation does not imply knowledge" so it is "unlikely that these 'updates' included the substance of the investigation." AR at 356 (BCNR Analysis of RDML Weber's Participation in the BOI). Such a conclusion, however, ignores the substance of the texts and emails received by RDML Weber as discussed *supra*. The BCNR's decision also expressly ignores the OLC's AO finding there was "personal knowledge." *See* AR at 388 (OLC Advisory Opinion). With these problems at hand, at oral argument, the government attempted to distinguish RDML Weber's personal knowledge from the type of knowledge that would be in violation of SECNAV 1920. *See* Tr. at 65:14–66:4 ("THE COURT:  Although the OLC went on to state that the limited knowledge created did not have any evidence to create injustice.  Doesn't the finding of 'personal knowledge' mean that the BOI was constituted in direct violation of SECNAV 1920?  [GOVERNMENT]:  No, because the regulation requires there be personal knowledge . . . pertaining to the case.  This . . . finding by the legal advisor was that Rear Admiral Weber had personal knowledge of his having been relieved of command which, as soon as the board opened, every member knew.  So that cannot be the meaning of that, otherwise every board member would have to be disqualified every time.  Their charge was to figure out . . . whether that . . . was supported or not."). Despite the government's attempt to re-characterize RDML Weber's knowledge of plaintiff's case as anything less than personal knowledge, the record demonstrates RDML Weber possessed personal knowledge of plaintiff, plaintiff's case, and BGen Morris's investigation into plaintiff and plans to remove plaintiff from command. The BCNR opinion did not thoroughly analyze the record, it merely made a conclusory determination that any personal knowledge on RDML Weber's part was harmless. *See* AR at 357 (BCNR Analysis of RDML Weber's Participation in the BOI). Without adequately addressing the many facts discussed *supra* pointing to RDML Weber's personal knowledge of plaintiff's case via his continued communications with BGen Morris, the BCNR's decision to permit RDML Weber to participate in the BOI is "unsupported by substantial evidence", further underscoring the BCNR's decision was "arbitrary [and] capricious." *Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005) (explaining a court "will not disturb the decision of the corrections board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence" (citing *Haselrig v. United States*, 333 F.3d 1354, 1355 (Fed. Cir. 2003)); *see Carlborg v. United States*, 2024 WL 4675290 at *1 (Fed. Cir. 2024) (per curium) ("[W]e will not disturb the decision of the BCNR 'unless it is arbitrary, capricious,

contrary to law, or unsupported by substantial evidence.'" (quoting *Chambers*, 417 F.3d at 1227)).

The Court next analyzes the BCNR's decision to not find error in RDML Weber serving on the BOI in light of the factual record despite RDML Weber's personal knowledge statutorily disqualifying him from properly serving as a member of the BOI. *See* SECNAVINST 1920.6D encl. (11), ¶ 3(f) (detailing the requirements mandate an officer "with personal knowledge cannot be appointed). Specifically, the inclusion of RDML Weber on the BOI was arbitrary and capricious for all the factual reasons the Court discussed *supra*. First, RDML Weber, as the director of the Medical Service Corps, of which plaintiff was a member, was in communication with BGen Morris, the very individual who initiated the investigation against plaintiff, despite having no reason to communicate unless it was to discuss plaintiff's case. *See* AR at 356–58 (BCNR Analysis of RDML Weber's Participation in the BOI); AR at 437–38 (Letter from LtCol Acosta to the BCNR); AR at 837–41 (Email Chain Involving RDML Weber and BGen Morris); Tr. at 36:18–22. Second, RDML Weber and BGen Morris discussed updates regarding plaintiff's case through emails and text messages throughout the investigation, *see* AR at 837–41 (Email Chain Involving RDML Weber and BGen Morris), and BGen Morris tasked RDML Weber with watching over plaintiff and to "keep eyes on [plaintiff]," *see* AR at 838 (0941 8 March 2020 Email from RDML Weber to RDML Hancock who added BGen Morris) ("As mentioned in my text, it's important that we have eyes on [plaintiff] in the coming days."); Tr. at 58:1–16. Third, RDML Weber neglected to disclose these communications when he was explicitly asked about his involvement in plaintiff's case. *See* Tr. at 17:22–18:9. In fact, RDML Weber went so far as to maintain he had no other communications about plaintiff's case until he was confronted with the email communications, and only then did he admit communication with BGen Morris throughout the pendency of plaintiff's case—despite acknowledging the requirement he was to testify truthfully at voir dire. *See* Tr. at 23:13–24:19. Fourth, despite the OLC finding RDML Weber possessed personal knowledge of the case given the strong factual support of such a finding, the BCNR determined—without explanation—the personal knowledge was harmless and RDML Weber was properly placed on the BOI. *See* AR at 356–58 (BCNR Analysis of RDML Weber's Participation in the BOI). *See* AR at 388 (OLC Advisory Opinion); AR at 437–38 (LtCol Acosta's Letter to the BCNR); AR at 898 (Summarized BOI Tr.).

Given the extensive record support of RDML Weber's knowledge set forth *supra*, the Court finds RDML Weber's knowledge satisfies the standard for personal knowledge, necessarily excluding RDML Weber's participation on the BOI. Although the BCNR similarly found RDML Weber had personal knowledge of plaintiff's case, the BCNR did not offer substantial evidence to support its conclusion the personal knowledge did not disqualify RDML Weber's BOI participation. Unlike the BCNR, the Court cannot ignore the factual record of RDML Weber's personal knowledge, nor ignore the statutory requirement an officer with personal knowledge must be excluded from a BOI. The BCNR finding RDML Weber lacked personal knowledge of plaintiff is not supported by substantial evidence, as the record is replete with facts indicating personal knowledge, and the BCNR offered no explanation or analysis as to how those facts could be excluded as non-disqualifying. *See infra*. Accordingly, as the record reflects there is substantial evidence to support RDML possessed personal knowledge, *see*

SECNAVINST 1920.6D encl. (11), ¶ 3(f) (detailing the requirements mandate an officer "with personal knowledge cannot be appointed), the Court finds the BCNR's determination not to correct the BOI's finding that RDML Weber was properly on the BOI to be "arbitrary, capricious, and contrary to law, and unsupported by substantial evidence," *Chambers*, 417 F.3d at 1227 (explaining a court "will not disturb the decision of the corrections board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence" (citing *Haselrig*, 333 F.3d at 1355))*; see Carlborg*, 2024 WL 4675290 at *1 (per curium) ("[W]e will not disturb the decision of the BCNR 'unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.'" (quoting *Chambers*, 417 F.3d at 1227)).

### B.    Whether the Inclusion of RDML Weber on the BOI Constituted Harmless Error

Given the Court determines RDML Weber had impermissible personal knowledge of plaintiff's case under SECNAV 1920 when serving on the BOI, the Court next reviews the harmless error rule as applied to RDML Weber's BOI participation.  Plaintiff argues RDML Weber's participation despite his personal knowledge cannot be brushed aside as mere harmless error, as "[h]armless error review is inapplicable to such errors when the reviewing body is unable to assess the magnitude of the errors, such as a procedural error in the composition of a board as required by statute, regulation, or internal operating procedure."  Pl.'s MJAR at 11 (citing *Wagner v. United States*, 365 F.3d 1358, 1362 (Fed. Cir. 2004)).  Further, plaintiff argues the BCNR's harmless error finding is contrary to law because the BCNR and the Court are unable to assess the magnitude of the error in this case due to the very fact RDML Weber possessed personal knowledge of plaintiff both before and during the BOI proceedings.  *See id.* at 13 (quoting *Wisotsky*, 69 Fed. Cl. at 309 (citing *Wagner*, 365 F.3d at 1362)).  Given there is no way to determine the extent of potential inequitable taint posed by RDML Weber's personal knowledge on plaintiff's BOI proceedings, plaintiff argues the personal knowledge constituted a structural defect the Court cannot ignore.  *See* Pl.'s MJAR at 11–12.  The government also acknowledged if the Court were to find personal knowledge is a structural defect here, then *Wagner* would apply, undermining the government's arguments and effectively putting the error "on all fours."  Tr. at 69:13–18 ("THE COURT:  If the harmless error rule were to apply in this case, wouldn't that 'erode' essential components of fairness?  [GOVERNMENT]:  This would be on all fours of Wagner's if you were to find that there was a compositional error or a structural error.").  Also relevant to the Court's analysis here, the government further conceded personal knowledge *could be* a structural or compositional error and render the BOI "fatally defective."  Tr. at 13:2–5 (THE COURT:  So personal knowledge under SECNAV 1920 cannot ever been considered a structural error or it could in some instances? [GOVERNMENT]:  I suppose it could.").

The Court first reviews the Federal Circuit's *Wagner* decision, which dictates the test for when courts should refrain from applying the harmless error rule.  *See generally Wagner*, 365 F.3d at 1362–64.  Writing for the *Wagner* panel, Judge Gajarsa instructed when circumstances "involve[] procedural errors regarding the composition of military selection boards . . . harmless error review is inapplicable."  *Wagner*, 365 F.3d at 1362.  In *Wagner*, the panel held harmless error review is unnecessary when either "the error is 'fundamental'" or it is unlikely the court can predict the harm done by the error.  *Id.* at 1363.  The panel further explained harmless error

is inappropriate when "the magnitude of the effect of the error on the proceeding defies assessment by a review body" and "[w]here the effect of the error on the outcome of a proceeding is unquantifiable . . . [the Court] will not speculate as to what the outcome might have been had the error not occurred." *Id.* As the Army in *Wagner* contravened the statutory requirement for the Secretary to preapprove "the overall scheme of the involuntary release procedures," the panel held while it was unsure whether the error was fundamental, the significance of the error's impact was unclear and, consequently, plaintiff's dismissal from the military was improper. *Id.* at 1364. The Court additionally reviews three Court of Federal Claims cases dealing with the applicability of the harmless error rule in challenges to military administrative boards. In *Doyle*, Judge Bennett provided two rationales for not applying the harmless error rule: (1) "some errors are so inimical to judicial or fair process that their violation cannot be tolerated under any circumstances"; and (2) "some errors, such as the improper composition of a jury or the bias of a judge, 'has no way of evaluating the effect of the error on the judgement in the dark of what might have been but never was.'" *Doyle v. United States*, 599 F.2d 984, 995 (Cl. Ct. 1979). As the promotion board in *Doyle* did not include any Reserve officers and, consequently, the board was improperly constituted, Judge Bennett held the board's determination was invalid and must be reconsidered. *Id.* at 1004. In *Caldbeck*, Judge Braden applied *Wagner* recognizing there are "two justifications for refusing to apply the harmless error rule: (1) avoiding the erosion of essential components of a fair trial; and (2) the inability of a reviewing body to assess the magnitude of the error." *Caldbeck v. United States*, 109 Fed. Cl. 519, 533 (2013) (*citing Wagner*, 365 F.3d at 1363). Since the BOI in *Caldbeck* did not include a member of the same competitive category and the court determined it was impossible to determine the effect of this error, Judge Braden refused to apply the harmless error rule and held the BOI was improperly composed and plaintiff's separation from the Navy was unlawful. *See id.* at 534. In *Wisotsky*, since the BOI convened without inclusion of an officer in the same competitive category as plaintiff as necessitated by Navy regulation, Judge Horn held the error was not subject to harmless error review, "the [BOI] was improperly constituted," the BCNR was arbitrary and capricious in its determination of no improper composition, and, consequently, plaintiff was not legally separated from the military. *See Wisotsky v. United States*, 69 Fed. Cl. 299, 306–11 (2006).

Here, the BCNR determined any personal knowledge on RDML Weber's part was harmless because "the record reflects that the BOI findings and recommendation were unanimous. Accordingly, [RDML Weber's] vote did not influence the outcome." AR at 357 (BCNR Analysis of RDML Weber's Participation in the BOI). The BCNR justified its conclusion by noting the BOI was not persuaded by plaintiff's "speculation regarding the influence that [RDML Weber] may have wielded in the deliberation room, as the BOI members were all flag officers and a Navy MSC officer is not likely to exercise and outsized influence over other flag officers on a non-medical decision like that assigned to the BOI" to support RDML Weber's inclusion on the BOI was harmless. *See* AR at 357 BCNR Analysis of RDML Weber's Participation in the BOI). The Court, however, "will not speculate as to what the outcome might have been had the error not occurred" when "the effect of an error on the outcome of a proceeding is unquantifiable." *Wagner*, 365 F.3d at 1363. The Court already determined RDML Weber possessed impermissible personal knowledge of plaintiff's case under SECNAV 1920 and RDML Weber's inclusion on the BOI was therefore improper. *See supra* Section V.A. As the BCNR arbitrarily and capriciously ignored the personal knowledge possessed by RDML Weber, its decision to allow RDML Weber to remain on the BOI was

contrary to law. SECNAV 1920 explicitly states an officer "with personal knowledge cannot be appointed." *See* SECNAVINST 1920.6D encl. (11), ¶ 3(f). At oral argument, the government agreed *Wagner* stood for the proposition that "[t]his [case] would be on all fours to of Wagner if [the] court were to find that there was a compositional error or structural error," Tr. at 69:16–18, and "the harmless error rule often does not apply when a reviewing body is unable to assess the magnitude of the error at issue," specifically, the government agreed it is not available when there is a "structural compositional error" and personal knowledge can constitute such error, *see* Tr. 67:3–21; *see also* Tr. at 12:15–20 ("THE COURT: So can personal knowledge create a structural error? [GOVERNMENT]: [T]he bottom line here is that [plaintiff] was entitled to a fair hearing. There's no question about that."). Yet, the BCNR's finding RDML Weber's personal knowledge did not disqualify him to participate on the BOI, despite his ineligibility under the SECNAV, potentially impacted the fairness of the proceedings. *See* Tr. at 70:22–71:15 ("[PLAINTIFF:] Because I would also argue while there were two other members who voted, there were also deliberations, and who knows to what extent the three members discussed things amongst themselves, and there . . . also was the fact that Rear Admiral Weber was engaged in questioning the government's witnesses and eliciting additional details. There's just no way to quantify what would have had happened if he had not been involved in the proceedings and a different person had been there instead."). At oral argument, plaintiff articulated the Court cannot "evaluate what effect improper board composition had on [the] BOI hearing" due to the personal knowledge possessed by RDML Weber. *See* Tr. at 70:25–71:19 ("[PLAINTIFF:] [I]t's impossible to evaluate what effect improper board composition ha[s] on a BOI hearing, and harmless error review is therefore inappropriate and inapplicable when the BOI has an improper member . . . I would also argue while there were two other members who voted, there were also deliberations, and who knows to what extent the three members discussed things amongst themselves, and there w[as] also the fact that Rear Admiral Weber was engaged in questioning the government's witnesses and eliciting additional details. There's just no way to quantify what would have happened if [RDML Weber] had not been involved in the proceedings and a different person had been there instead."). The Court agrees it is unable to determine what impact RDML Weber had on the BOI—even though the decision was unanimous because the Court cannot understand how the personal knowledge impacted deliberations—making the "error on the outcome unquantifiable." *See Wagner*, 365 F.3d at 1363 (holding when an error is "unquantifiable" the court "will not speculate as to what the outcome might have been had the error not occurred"). As the Court does not have the ability to determine the precise magnitude of harm caused by RDML Weber's pre-existing personal knowledge and improper participation on the BOI, the harmless error rule is inapplicable here. *See Wagner*, 365 F.3d at 1363 (explaining harmless error review is unnecessary when either "the error is 'fundamental' or it is unlikely the court can predict the harm done by the error"). As such, the BCNR's decision RDML Weber's inclusion on the BOI constituted harmless error was not supported by substantial evidence and was contrary to law. The BCNR finding of no personal knowledge is not supported by substantial evidence, especially given the OLC in its AO found "Rear Admiral Weber had personal knowledge of [plaintiff] being relieved of command," AR at 388 (OLC Advisory Opinion), but the BCNR determined—without explanation or analysis—"[e]ven if [RDML Weber] had disqualifying personal knowledge . . . the Board believed that his participation in the BOI would have been harmless error," AR at 357 (BCNR Analysis of RDML Weber's Participation in the BOI). As already discussed *supra*, however, this type of error is unquantifiable and neither the Court nor the BCNR can determine the effect of the error on the

BOI proceedings. *See Wagner*, 365 F.3d at 1363. This is especially true given the Court does not, and the BCNR did not, have a transcript of the BOI voir dire questions to RDML Weber regarding his communications about plaintiff as discussed *supra*. Furthermore, the BCNR ignored the OLC's finding of personal knowledge, despite ample record support indicating RDML Weber had personal knowledge of plaintiff, making it even less clear how the BCNR's "arbitrary, capricious," and "unsupported by substantial evidence" decision to ignore the OLC decision did not result in injustice towards plaintiff. *Chambers*, 417 F.3d at 1227 (Fed. Cir. 2005) (explaining a court "will not disturb the decision of the corrections board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence" (citing *Haselrig*, 333 at 1355)); *see Carlborg*, 2024 WL 4675290 at *1 (per curium) ("[W]e will not disturb the decision of the BCNR 'unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.'" (quoting *Chambers*, 417 F.3d at 1227)).

After complete review of the record, and for the reasons discussed *supra*, the Court finds plaintiff has properly offered extensive record support of RDML Weber's personal knowledge of plaintiff's case which necessarily made RDML Weber ineligible to serve on the BOI. *See* SECNAVINST 1920.6D encl. (11), ¶ 3(f) ("Officers with personal knowledge pertaining to the respondent's case cannot be appointed to serve as a member of the Board considering the case."). Further, the communications between RDML Weber and BGen Morris, as well as RDML Weber's tasks related to "hav[ing] control over" plaintiff, "keeping eyes" on plaintiff, and finding plaintiff a temporary assignment, raise the impact of RDML Weber's participation in the three-member BOI to introduce unfairness in BOI proceedings as the only member with greater knowledge of plaintiff and the charges. *See supra*. When expressly pressed about his knowledge of plaintiff, RDML Weber omitted the extent of his involvement with plaintiff until he was confronted with evidence of his communications with BGen Morris, further suggesting the potential for unfair taint to plaintiff's BOI deliberations. *See supra*. With no way for the BCNR or Court to determine the extent RDML Weber's personal knowledge had on the BOI proceedings, and what that personal knowledge may have introduced in BOI deliberations, "harmless error review is inappropriate . . . ." *See Wagner*, 365 F.3d at 1363. Accordingly, the Court finds the BCNR's decision to ignore the OLC's finding of personal knowledge, and to apply the harmless error rule despite its inapplicability given the record support for RDML Weber's personal knowledge, is "arbitrary, capricious, contrary to law, and unsupported by substantial evidence." *Chambers*, 417 F.3d at 1227 (Fed. Cir. 2005) (explaining a court "will not disturb the decision of the corrections board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence" (citing *Haselrig*, 333 F.3d at 1355)); *see also Carlborg*, 2024 WL 4675290 at *1 (per curium) ("[W]e will not disturb the decision of the BCNR 'unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.'" (quoting *Chambers*, 417 F.3d at 1227)).

## VI.    Whether the BCNR Arbitrarily and Capriciously Concluded There Was No Unlawful Command Influence in Plaintiff's BOI

Plaintiff alleges the CA committed several instances of both actual and apparent UCI. The government, however, argues UCI is not applicable to the BOI context. The Court first determines whether UCI is applicable to BOI proceedings by evaluating the statutory text of the Uniform Code of Military Justice ("UCMJ"). The Court then analyzes whether plaintiff has

adequately proved he was subjected to the several alleged instances of actual and apparent UCI under the applicable standards.

### A.  Whether Unlawful Command Influence Can Apply to a BOI Proceeding

Plaintiff argues UCI is applicable within the BOI context, so the Court first evaluates the relevant statutory text to determine whether a UCI claim can be properly alleged in the context of a BOI proceeding.  The UCMJ in Article 37(a) of 10 U.S.C. § 837 defines UCI as follows:

> No court-martial convening authority, nor any other commanding officer, may censure, reprimand, or admonish the court or any member, military judge, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercise of its or his functions in the conduct of the proceeding . . . .  No person subject to this chapter may attempt to coerce or, by any unauthorized means, attempt to influence the action of a court-martial *or any other military tribunal* or any member thereof, in reaching the findings or sentence in any case . . . .

10 U.S.C. § 837(a) (emphasis added).

Under 10 U.S.C. § 837(a), unlawful command influence applies to the actions of a "court-martial or any other military tribunal."  *Id.*  The statute allows for a party to allege UCI for these types of military bodies but omits any clear statement permitting a party to allege a UCI claim against another type of military body, including administrative proceedings like a BOI. *See id.*  Under the *exclusio unius* canon, "the expression of one thing implies the exclusion of others."  ANTONIN SCALIA & BRIAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107 (2012).  Although courts do not enlarge statutes to reach more than the text, *see id.*, the Court nevertheless evaluates the parties' arguments to determine whether UCI applies here.

Plaintiff argues while UCI "is traditionally defined and prohibited in the context of military justice proceedings . . . the BCNR has previously considered UCI in a BOI as a reason to remove a BOI from the petitioner's record."  *See* Pl.'s MJAR at 15 (citing AR at 494–98 (Review Naval Record Case Applying UC)).  Glaringly, as noted by the government, plaintiff cites no caselaw to support UCI applying to BOIs.  *See* Gov't's Cross-MJAR at 21 ("[Plaintiff] provides no legal authority in support of the proposition that the concept of UCI applies to BOIs.").  At oral argument, plaintiff also agreed no case addresses whether UCI can be considered in a BOI.  *See* Tr. at 80:10–15 ("THE COURT:  Is there any case addressing whether a UCI can be of concern at a BOI?  [PLAINTIFF:]  I have not found one where they discussed whether or not it should be applied.  I've just found a few cases in which the BCNR did substantively consider whether or not UCI occurred.").  Likewise, the government could not cite a case at oral argument holding UCI does not apply to BOI.  *See* Tr. at 80:16–81:9 ("[THE COURT:]  [T]he government's brief notes the Doolen[2] case . . . Does the government agree that

---

[2] In *Doolen v. Esper*, 2018 WL 4300529 (S.D.N.Y Sep. 10, 2018), plaintiff, a former cadet at the United States Military Academy at West Point brought an action under the Administrative Procedure Act, 5 U.S.C. § 551, and 42 U.S.C § 1983, alleging the decision to separate him from West Point was arbitrary and capricious and in violation of the Fifth Amendment of the United States Constitution.  *Id.* at *1.  While *Doolen* explains "the Uniform Code of

Doolen . . . is just different applying to informal proceedings at West Point, not a BOI? [GOVERNMENT:] It was a different proceeding for sure, but it was the same idea. . . . So it's, I suppose, persuasive, interesting. Certainly not binding.").

While 10 U.S.C. § 837(a) suggests UCI can apply to the "action of a court-martial or any other military tribunal," the Court of Appeals for the Armed Forces in *Ashby* found mere factfinding entities are not involved in court-martial proceedings and the principle of unlawful command influence is therefore inapplicable. *See United States v. Ashby*, 68 M.J. 108, 128 (C.A.A.F. 2009) (explaining "the principle of unlawful command influence [is] not applicable" to a "factfinding entity . . . not involved in [] court-martial proceedings"). Instructive here, BOIs are not court-martial proceedings or any sort of military tribunal; BOIs do not fall within the boundaries provided by the statute—plainly not a "court-martial or any other military tribunal."[3] *See id.* As such, the Court agrees with the government—UCI cannot apply within the BOI context.

## B. Whether the BCNR Was Arbitrary and Capricious in Determining There Was No Unlawful Command Influence Present at Plaintiff's BOI

Beyond UCI not applying to BOI proceedings, the Court nevertheless analyzes whether actual or apparent UCI was present at plaintiff's BOI. The Court proceeds by analyzing plaintiff's arguments as to the BCNR's UCI decision to determine whether the BCNR's finding of no UCI tainted the fairness of plaintiff's case and was arbitrary and capricious.

Under military law, UCI is "prohibited in the context of military justice proceedings." *See* 10 U.S.C. § 837. UCI can be actual or apparent: (1) actual UCI occurs "when a superior acts to influence the proceedings via unauthorized means, regardless of intent"; or (2) apparent UCI occurs when "an objective, disinterested observer, fully informed of all facts and circumstances, would harbor a significant doubt about the fairness of the proceedings." *United States v. Barry*, 78 M.J. 70 (C.A.A.F. 2017). Plaintiff alleges there was both actual and apparent UCI in the BCNR's determination of no credible UCI in the following actions: (1) the BOI selecting RDML Weber as a board member and not dismissing him; (2) the private meetings

---

Military Justice Article 37(a), 10 U.S.C. § 387, does not apply to informal disciplinary hearings," *Doolen* is different than this case as *Doolen* was applying the UCMJ to informal proceedings at West Point and not a BOI. *Id.*; *see also* Tr. at 80:21–81:3 ("THE COURT: Does the government agree that [*Doolen*], although, stating . . . UCI does not apply to informal disciplinary hearing that that case is just different [as it] appl[ies] to informal proceedings at West Point, not a BOI? [GOVERNMENT:] It was a different proceeding, for sure, but it was the same idea.").

[3] The Navy itself defines BOIs as "administrative hearing at which a service member may be processed for an administrative discharge." Navy JAG Corps, Judge Advocate General's Corps (2024), https://www.jag.navy.mil/legal-services/dso/faq/#:~:text=Administrative%20Separation%20Boards%20(Admin%20Boards,and%20not%20punitive%20in%20nature. The Navy states while BOIs "are similar in some ways to courts-martial, they are solely administrative and not punitive in nature." *Id.* A BOI is also not a tribunal. According to Colonel Winthrop—the "Blackstone of military law" according to the Supreme Court, *see Reid v. Covert*, 354 U.S. 1, n.38 (1957)—defined a military tribunal as "the specific law governing the [military] as a separate community" and is "operative only in time of war or like emergency" and "regulated the relations of enemies and authorizes military government and martial law," William Winthrop, MILITARY LAW AND PRECEDENTS 15 (2d ed. 1920). Thus, a BOI is not a court-martial proceeding or a military tribunal, which further supports a finding UCI does not apply to the BOI context.

between the CA—who acted improperly in her previous actions as CA and was allegedly tied to "Fat Leonard"—and the BOI members; and (3) the "mere presence of a CA in the courtroom during a court-martial is some evidence of UCI." Pl.'s MJAR at 15–16 (*citing U.S. v. Harvey*, 64 M.J. 13 (C.A.A.F. 2006)). The government argues the Court should reject plaintiff's contentions because: (1) "the BCNR reasonably and rationally rejected [plaintiff's] contention of improper interaction between the [CA] and the members of the BOI;" (2) "[t]he record reflects that the interactions between the [CA] and members of the BOI were purely social in nature;" and (3) plaintiff "through his counsel, could have, but did not, question the members on the record about the visits." *See* Gov't Cross-MJAR at 28.

To prove actual UCI, plaintiff "must establish: (1) facts, which if true, constitute unlawful influence; (2) unfairness in the court-martial proceedings (*i.e.*, prejudice to the accused); and (3) that the unlawful influence caused that unfairness." *Barry*, 78 M.J. at 77 (citation omitted). While the "initial burden is low, it requires more than mere allegation or speculation" and plaintiff "must show 'some evidence' in order to sufficiently raise the issue." *Id.* (citation omitted). This three-prong test also requires a command relationship as UCI is the improper use, or perception of use, of superior authority. *See* Gilligan and Lederer, Court Martial Procedure § 18-28.00 (4th ed. 2015).

Here, plaintiff does not argue, and cannot prove, there was command influence or superior authority present through any of the claimed instances of UCI. To begin, the CA and all BOI members were of the same rank—Rear Admirals, O-7.[4] *See* AR at 358 (BCNR Analysis of UCI) ("The BOI members were each flag officers holding the same rank as the convening authority. Accordingly, it is unlikely [the CA] could have influenced them to act contrary to their responsibilities as impartial BOI members."). As the CA and all the BOI members were the same rank, there could not have been UCI as there was no command influence by someone in a higher level of command or rank guiding the BOI's decision. *See* Tr. at 86:8–16 ("[GOVERNMENT:] The idea of command influence is that someone who was higher in level in command uses that higher rank to basically guide the decisions."). Given there is no command influence or superior authority present here, the three-prong test for actual UCI does not apply and therefore actual UCI cannot be present. *See* 10 U.S.C. § 837; *see also Barry*, 78 M.J. at 77 (citation omitted).

Plaintiff also contends there was apparent UCI, arguing although the BNCR "speculates as to the possible social and appropriately courteous interactions of RDML Bolivar with the members of the BOI, there is no substantial evidence to support this contention." *See* AR at 358 (BCNR Analysis of UCI). According to plaintiff, "the appearance of UCI occurred when

---

[4] In its Cross-MJAR, the government cited to plaintiff's response to the BOI for the proposition that the CA, RDML Bolivar, was an O-8. *See* Gov't's Cross-MJAR at 7 ("Specifically, [plaintiff] alleged the following errors: unlawful command influence because the convening authority (an O-8) twice met with the board members (all O-7s) on the day of the BOI."). Based on the record, however, the Court notes there is no evidence RDML Bolivar was not the same rank as the BOI members. The record supports the CA and BOI members were all the same rank. *See* AR at 358 (BCNR Analysis of UCI) ("The BOI members were each flag officers holding the *same rank* as the convening authority.") (emphasis added); *see also* Tr. at 86:8–16 ("[GOVERNMENT:] Here, there is no command influence because [the BOI members] were not in [RDML Bolivar's] command because they are the *same rank*.") (emphasis added).

[RDML Bolivar] – the individual overseeing the BOI, responsible for the selecting board members and ruling on any challenges for cause – met privately with the members of the BOI in the midst of the BOI proceedings." AR at 358 (BCNR Analysis of UCI). Plaintiff alleges the fact the BOI convened privately twice, including once immediately before the hearing, was improper—especially considering the accusations against plaintiff at the BOI. *See* Tr. at 88:17–89:13 ("[PLAINTIFF:] I would point out the irony of the BCNR's position here in that, you know, [plaintiff] is accused of giving preferential treatment to certain individuals and having an inner circle because, you know, [the CA] invited these people in and had closed-door meetings with them. . . . [E]ven if [the interactions were] purely social . . . that's just not an appropriate interaction in something where [the CA] is supposed to be unbiased and impartial and overseeing these proceedings."). The government agrees there may properly be questions as to the propriety of the interactions between the CA and the BOI members and a possible question of fairness as to those interactions, but argues given all the members were the same rank there could not have been any apparent UCI. *See* Tr. 90:11–91:6 ("THE COURT: [W]ith respect to some of the interactions that plaintiff . . . raised, do you agree that there is at least questions of fairness in the BOI proceedings when there are interactions between the convening authority and BOI members on multiple occasions? That can't be standard procedure. [GOVERNMENT]: Well, it may raise a question . . . the argument don't hold water here . . . Again, because these people were the same rank and for all the explanations the BCNR gave about why that would not be inappropriate or why it was done. Would it raise a question? Sure."). Further, the government argues plaintiff's counsel knew about the interactions and should have asked questions to discern answers as to any alleged impropriety. *See* Tr. 90:11–91:6 ("[THE GOVERNMENT:] We have factual evidence even in the transcript that it occurred and . . . certainly his counsel could have asked any questions about what was said out there and that would have resolved it. But, again, his counsel, perhaps knowing what he knew, . . . or fearing the answers that he wouldn't want, didn't pursue it, didn't ask any questions about it. . . . [and] his counsel, if they were really concerned, should have asked questions about that . . . and they didn't ask those questions."). Notably, at oral argument plaintiff could not point to any specific facts or record support of any influence by the CA or evidence demonstrating these meetings were anything beyond social interactions. *See generally* Tr. at 100:3–24 ("[THE COURT:] [C]an [plaintiff] point to any specific facts or evidence in the record that there was any influence or anything beyond these interactions being social? [PLAINTIFF]: I don't have any evidence that [the] interactions were more than social.").

Apparent UCI does not require prejudice to the accused; rather, the prejudice results from what was done to the "public's perception of the fairness of the military justice system as a whole." *United States v. Boyce*, 76 M.J. 242, 248–249 (C.A.A.F. 2017). In evaluating the appearance of UCI, the Court must consider, objectively, "the perception of fairness in the military justice system as viewed through the eyes of a reasonable member of the public." *Ashby*, 68 M.J. at 129 (citing *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006)). Plaintiff urges "the relevant consideration [for the Court] is 'the total effect of [command] conduct on the appearance of fairness and freedom from command influence.'" *Id.* (quoting *United States v. Rosser*, 6 M.J. 267 (C.M.A. 1979)). As the BCNR determined, the public perception is the private meetings were a mere social gathering. *See* AR at 358 (BCNR Analysis

of UCI) ("The evidence clearly reflects that the [CA's] interactions with the BOI members w[ere] purely social in nature."). While the Court agrees there may properly be questions as to the propriety of the interactions and a possible question of fairness, given plaintiff's counsel did not pursue the issue at the BOI, all members involved in the interactions were of the same rank, *see* Tr. at 90:11–91:6, and plaintiff cannot provide any factual support or evidence of the interactions being anything more than social, *see generally* Tr. at 100:3–24, there is no apparent UCI. Further, there is nothing in the record supporting a perception of UCI from the "social gatherings" between those of the same rank simply touring a building. *See Boyce*, 76 M.J. at 248–249 (explaining prejudice is what is done to the "public's perception of the fairness of the military justice system as a whole").

As discussed *supra*, since all the BOI members and the CA were Rear Admirals, O-7, it is evident to the Court there could be neither actual UCI nor apparent UCI. Additionally, as plaintiff could not point to any evidence or record support of either actual or apparent UCI, the BCNR's determination of no UCI was not "arbitrary, capricious, contrary to law, or unsupported by substantial evidence" and the Court will not "disturb the decision" of the BCNR. *See Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005) (citing *Haselrig v. United States*, 333 F.3d 1354, 1355 (Fed. Cir. 2003)); *see also Carlborg v. United States*, 2024 WL 4675290 at *1 (Fed. Cir. 2024) (per curium) ("[W]e will not disturb the decision of the BCNR 'unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.'" (quoting *Chambers*, 417 F.3d at 1227)).

## VII.    Whether the BCNR Arbitrarily and Capriciously Concluded Plaintiff Was Not Deprived of Proper Notice

Plaintiff argues the BCNR arbitrarily and capriciously determined the BOI provided proper notice. Plaintiff argues the decision was incorrect because the SECNAV requires a BOI respondent to "be notified in writing at least 30 days before a BOI convenes" and the notice must "mention the specific alleged acts, omissions, or traits supporting the reasons for which he was being required to show cause" as required under the SECNAV. *See* Pl.'s MJAR at 23–24 (*citing* SECNAVINST 1920.6D encl. (11), ¶ 6). The government counters, arguing plaintiff "fails to establish that he was denied adequate notice of the basis for his proposed removal." *See* Gov't's Cross-MJAR at 24. According to the government, the BCNR correctly explained "the show cause notice [was] attached [to] the complete Command Investigation, which described all the behavior at issue." *Id.* (citing AR at 361–62 (BCNR Analysis of Notice)). The government concludes plaintiff failed to identify in his MJAR "any particular charge and/or finding of which he was unaware at the time of his BOI." *Id.*

Under the SECNAV, "the [BOI] notice must include . . . [t]he specific alleged acts, omissions, or traits supporting the reasons for which the respondent is being required to show cause for retention." *See* AR at 1330 (SECNAVINST encl. (11), ¶ 6). The BCNR found plaintiff's "contention that enclosure (15) lacked the specificity required . . . is without merit, and his continuing claim that [he] did not (and continues not to) know the specific acts for which he was required to show cause for retention lacks credibility." AR at 361–62 (BCNR Analysis of Notice). In doing so, the BCNR identified three documents purportedly containing adequate notice to plaintiff: (1) enclosure (15), "Notification of Administrative Show Cause

Proceedings," AR at 457–58; (2) enclosure (11), "Report and Disposition of Offenses," AR at 1156; and (3) enclosure (6), Final Report of Investigation into Complaint, AR at 863. *See* AR at 361–62 (BCNR Analysis of Notice). The BCNR found these three documents provided adequate notice because:

> Enclosure (6) specifically substantiated allegations that [plaintiff] harassed the female civilian employee and the female chief petty officer, and bullied the chief petty officer, with detailed explanations of the specific acts found to constitute such harassment and bullying. These three finding are obviously the three specifications of Article 92, UCMJ, violations that were listed on enclosure (15). Enclosure (6) also detailed with specificity [plaintiff's] acts which constituted fraternization . . . and constitute the two specifications of fraternization in violation of Article 134, UCMJ. Finally, the specific acts of conduct unbecoming an officer are admitted more difficult to identify from enclosure (6) . . . [but o]ne of the specifications of conduct unbecoming of an officer and gentleman in violation of Article 133, UCMJ, is obvious from enclosure (6). Specifically, enclosure (6) specifically found that toxic climate existed . . . under [plaintiff's] command, so petitioner was clearly notified that he would have to defend against this charge. The second specification of conduct unbecoming an officer and gentleman . . . is less obvious in enclosure (6) since it was not described as such in that document, but the conduct itself was described in the description of his fraternization with the chief petty officer . . . . Finally, the Board acknowledges that the third specification of conduct unbecoming an officer and gentleman in violation of Article 133, UCMJ is not clearly delineated in enclosure (6) . . . . However, the potential lack of adequate notice in enclosure (15) regarding this single specification was rendered moot when the BOI found this specification not to be substantiated by a preponderance of the evidence.

AR at 361 (BCNR Analysis of Notice). The BCNR further noted the BOI "found [plaintiff's] continuing claim of ignorance of the specific acts for which [he] was required to show cause for retention to lack credibility because the misconduct listed on enclosure (15) mirrored the specifications for which he was notified and refused NJP" and "[e]nclosure (11), not coincidentally, included three specifications of Article 92, UCMJ violations; three specifications of conduct unbecoming an officer and gentleman in violation of Article 133, UCMJ; and two specifications of fraternization in violation of Article 134, UCMJ, each of which described the specific acts constituting the violation as described in enclosure (6). Accordingly, Petitioner's continuing claim of ignorance in this regard is clearly disingenuous." AR at 361–362 (BCNR Analysis of Notice). Ultimately, the BCNR found "[t]hat [plaintiff] successfully defended himself against fully half of the allegations suggests the he did know what acts he was defending against and that his claim in this regard lacks credibility." AR at 362 (BCNR Analysis of Notice).

Although the Notification of Administrative Show Cause Proceedings is dated 31 July 2020, plaintiff confirms he did not actually receive the notice until 24 November 2020 because the Navy sent the document to the wrong command location. *See* AR at 922–23 (Notification of Administrative Show Cause Proceedings) (showing notification was sent to "Commander, Navy Region Mid-Atlantic"). Plaintiff nevertheless argues this notification "indisputably" does not list any "specific acts, omissions, or traits" as required by SECNAV 1920.6D. *See* Pl.'s MJAR at

24; *see also* AR at 922–23 (Notification of Administrative Show Cause Proceedings) (showing notification was sent to "Commander, Navy Region Mid-Atlantic"). As to the Report and Disposition of Offenses and the Final Report of Investigation into the Complaint, plaintiff argues the BCNR "acknowledged . . . '[t]he specific acts of conduct unbecoming an officer are admittedly more difficult to identify'" and the BCNR was unable to identify the acts underlying the "three alleged specifications of violation of UCMJ Article 133 anywhere in the Final Report" because the BCNR incorrectly believed "as long as an officer being required to show cause has paperwork somewhere that describes conduct that could be a violation, notification of specific acts, traits, or omissions – neither serves the purpose of the regulatory requirement nor in any way affords a fair opportunity to defend against the specific allegations." Pl.'s MJAR at 24–25 (quoting AR at 361–62 (BCNR Analysis of Proper Notice)). According to plaintiff, the "crux" of the notice argument is the government cannot give notice *just at some point* through *reference to references*; rather, the government must provide explicit notice in the show cause order with real allegations relevant to the BOI. *See* Tr. at 145:15–24 ("[PLAINTIFF]: [T]he crux of the argument isn't necessarily that [plaintiff] wasn't provided with a certain document, it's that the document he was given . . . [and] the government's position that as long as he's given documents at some point in the history and evolution of these charges notify him of allegations, . . . does not meet the requirement of the SECNAV instruction to provide him with notice of the specific acts, omissions, and traits for which he's being required to show cause."); *see also* Tr. at 139:1–21 ([PLAINTIFF:] [Plaintiff's] position is that [plaintiff] has to be given notice of the specific acts, omissions, and traits. And . . . the show cause notification does not do that . . . . [because the Navy's position] that [the Final Report of Investigation] was incorporated by reference . . . [in the show cause notification] and that's how [plaintiff] was notified . . . is [not] the fair notice that is required by the SECNAV instruction.").

The government, however, contends the BCNR correctly explained "the show cause notice [was] attached to the complete Command Investigation, which described all the behavior at issue." Gov't's Cross-MJAR at 24 (quoting AR at 361–62 (BCNR Analysis of Proper Notice)). At oral argument, the government stated plaintiff knew for months of the specific allegations against him. *See* Tr. at 144:15–145:5 ("THE COURT: Well, it's the government's duty to provide the notice within the time frame, correct? [GOVERNMENT]: So we're talking in the March/April time frame. This didn't go to hearing until December of later that year, so we're three to nine months away and I still have not heard that he didn't have a copy of the report and did not sign on April 13th an acknowledgement that these were exactly the charges. Now, this was in the context . . . of the UCMJ, to be sure. But it also showed this very investigation that was referred to in a letter he received on March 9th. It was sent to [plaintiff] and acknowledged by him . . . . And acknowledged by [plaintiff] on March 26th, so I just don't see that there's any error there."); *see also* Tr. at 147:25–148:6 ("[GOVERNMENT:] But . . . all [plaintiff] has to be told of are the specific details, and that form we looked at that he signed on April 13th specifically says these are the details of the offenses you're being charged with, and he portrayed no confusion in several responses afterwards or in his discovery request about what he was being charged with."); Tr. at 148:15–149:11 ("[THE COURT:] What was given to [plaintiff] in July of 2020? [GOVERNMENT]: July 31st, 2020, at [AR] page . . . 457 and 458. He was given this document . . . from the Commander of Naval PERSCOM . . . . And this is where it basically . . . lays out . . . the charges -- the violations of Article [92], 133, and 134.").

The SECNAV details "the notice must include . . . [t]he specific alleged acts, omissions, or traits supporting the reasons for which the respondent is being required to show cause for retention . . . ." AR at 1330 (SECNAVINST encl. (11), ¶ 6). While it is clear the government did not provide plaintiff with actual notice of the specific allegations *in the show cause notification*, plaintiff received—and responded to—the allegations against him. As an initial matter, as discussed *supra*, plaintiff did not receive the show cause notification until 24 November 2022, even though it was dated 31 July 2020, because the Navy inadvertently sent the document to the wrong command location. *See* AR at 457–58 (Notification of Administrative Show Cause Proceedings); *see also* AR at 864 (24 Nov. 2020 email to plaintiff) (attaching Notification of Administrative Show Cause Proceedings). Despite plaintiff not possessing the show cause notification, he had already received multiple documents in connection with the investigation. For example, as of 9 March 2020, plaintiff received the Detachment for Cause, *see* AR at 853–54, from BGen Morris, which contained as an enclosure the Final Report of Investigation, *see* AR at 879–81, which relied on the Command Investigation and all enclosures, *see* AR at 605–759, to make a determination on the allegations against plaintiff. The Detachment for Cause explained, "[b]ased on the finding and opinions in [the Command Investigation], [BGen Morris] substantiated allegations of harassment, bullying and fraternization" against plaintiff and recommended plaintiff "be required to show cause for retention" in the Navy. AR at 853–54. Plaintiff sent a letter acknowledging his receipt of the Detachment for Cause on 26 March 2020. *See* AR at 814. Plaintiff then signed his waiver of Nonjudicial Punishment on 13 April 2020 and again acknowledged he received the Command Investigation Report which the alleged violations of UCMJ Articles 92, 133, and 134 were based on. *See* AR at 299–302 (Nonjudicial Punishment Notification). On 30 April 2020, plaintiff then submitted a Reply to the Report of Misconduct, *see* AR at 292–94, which BGen Morris considered and noted his "recommendation remain[ed] that he be required [to] show cause," AR at 291. The record therefore supports a finding plaintiff was aware of the specific allegations and charges against him at the latest in April 2020, despite not yet having the show cause notification.

Beyond the record supporting plaintiff's general receipt of notice regarding specific allegations against him, the Court reviews and compares the show cause notification, AR at 457–58, and the Final Report of Investigation, AR at 879–81, to determine if the BCNR was arbitrary and capricious in determining plaintiff received adequate notice under the SECNAV. The show cause notification—despite lacking in detail—provided a list of charges against plaintiff: (1) "Violation of UCMJ Article 92 (Failure to obey order or regulation) (three specifications);" (2) Violation of UCMJ Article 133 (Conduct unbecoming an[] officer and gentleman) (three specifications);" and (3) Violation of UCMJ Article 134 (Fraternization) (two specifications)." AR at 457 (Notification of Administrative Show Cause Proceedings). The show cause notification also included procedural information for plaintiff and a requirement to show cause for an "inability to maintain adequate levels of performance as evidenced by a failure to conform to prescribed standards of military deportment," but overall lacked substantive information about the charges or detail of the facts substantiated the charges. *See generally* AR at 457–58 (Notification of Administrative Show Cause Proceedings). The Final Report of Investigation, unlike the show cause notification, was extremely detailed. *Compare* AR at 457–58 (Notification of Administrative Show Cause Proceedings) (comprising of two pages), *with* AR at 605–759 (Command Investigation Report) (comprising of over 150 pages including findings and enclosures). The Final Report of Investigation detailed BGen Morris's conclusions on whether

he agreed or disagreed with certain findings of facts and opinions from the Command Investigation. *See* AR at 855 (detailing BGen Morris's conclusions). The Final Report of Investigation goes on to substantiate allegations of harassment, bullying, fraternization, and a toxic command climate but found the allegations of sexual harassment to be unsubstantiated. *See* AR at 855–57 (explaining BGen Morris's reasoning for finding allegations substantiated or unsubstantiated). The substantiated allegations of harassment, bullying, fraternization, and toxic command climate in the Final Report of Investigation are analogous to the violations of UCMJ Articles 92, 133, and 134—just as the BCNR determined. *See supra*. Thus, even though plaintiff did not receive the show cause notification due to an administrative error, it was not prejudicial to plaintiff. Given the documents and notifications plaintiff received in the March and April 2020 timeframe, the record supports plaintiff was aware of the specific allegations against him and what he was required to show cause for retention. *See* SECNAVINST encl. (11), ¶ 6 (explaining "the notice must include . . . the specific alleged acts, omissions, or traits supporting the reasons for which the respondent is being required to show cause for retention"). Additionally, plaintiff had a chance to—and actually did—respond to the allegations against him well before the regulatory requirement of 30 days prior to the hearing. *See id.* (requiring a BOI respondent to "be notified in writing at least 30 days before a BOI convenes"). The BCNR therefore was not "arbitrary [and] capricious" in determining proper notice of the specific allegations were given to plaintiff and its decision was supported by substantial evidence. *Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005) (explaining a court "will not disturb the decision of the corrections board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence" (citing *Haselrig v. United States*, 333 F.3d 1354, 1355 (Fed. Cir. 2003)); *see Carlborg v. United States*, 2024 WL 4675290 at *1 (Fed. Cir. 2024) (per curium) ("[W]e will not disturb the decision of the BCNR 'unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.'" (quoting *Chambers*, 417 F.3d at 1227)).

## VIII.   Whether the BCNR Arbitrarily and Capriciously Decided the BOI did not Deprive Plaintiff of a Fair Hearing by Completing the BOI Hearing in One Day

Plaintiff alleges the BCNR arbitrarily and capriciously decided the BOI did not deprive plaintiff of a fair hearing because the BOI hearing was both unfair and partial, as the hearing took place in a single day and lasted well past midnight. Specifically, plaintiff argues the Senior Member of the BOI imposed "unreasonable time constraints" on the hearing, which ultimately caused the witnesses and BOI members to be exhausted and distracted from the proceedings. *See* Pl.'s MJAR at 18. Plaintiff also alleges the brevity of the hearing deprived him of the opportunity to properly present witness testimony. *See id.* at 19–20. The government responds the BCNR did not err as plaintiff was not deprived of a fair hearing by performing the BOI one day for the following reasons: (1) plaintiff specifically requested the BOI for 21 December 2020; (2) plaintiff "indicated that two days would be sufficient for the BOI"; (3) plaintiff never objected to the hearing continuing late into the night; and (4) plaintiff cannot point to any witness he was forced to exclude due to the time constraint or point to evidence not fully heard by the BOI. *See* Gov't's Cross-MJAR at 23 (citing AR at 347 (BCNR Review of Plaintiff's Naval Record; AR at 860–62 (0650 1 December 2020 Email from LtCol Acosta) (requesting two days to complete the BOI)). To determine whether plaintiff was deprived of a fair hearing, the Court

- 30 -

reviews: (1) whether plaintiff objected to the length of the BOI hearing; and (2) if there is any evidence plaintiff was effectively blocked from presenting before the BOI.

SECNAV 1920 affords "officers a full and impartial hearing at which they may respond to and rebut the allegations which form the basis for separation for cause . . . ." *See* AR at 1326 (SECNAVINST 1920.6D, encl. (11) ¶ 1). As such, any instance of an unfair or impartial hearing would render the BOI improper. *See generally* AR at 1326 (SECNAVINST 1920.6D, encl. (11) ¶ 1). The record indicates plaintiff requested a longer hearing before the proceeding began as detailed by plaintiff's counsel, LtCol Acosta: "[p]rior to the hearing, when the CA's Deputy Staff Judge Advocate . . . contacted me about scheduling the BOI, I informed him it would take at least two days to complete the BOI." AR at 438 (Letter from LtCol Acosta to the BCNR). LtCol Acosta further informally expressed for the hearing to continue to a second day, which was denied: LtCol Acosta recalled "we expressed to the Recorder and BOI Members that it would be best to recess the hearing early in the evening, or after the Recorder's presentation of the evidence . . . . My recollection is that the Senior Member did not grant our request, but instead wanted to finish the case that evening." AR at 439 (Letter from LtCol Acosta to the BCNR). Plaintiff, however, provided no evidence of a formal objection to the length of the BOI hearing. *See generally* Pl.'s MJAR at 18–19, 23; *see also* AR at 359–60 (BCNR Analysis of One Day Hearing); AR at 428 (Plaintiff's Statement to the BCNR); AR at 438–39 (Letter from LtCol Acosta to the BCNR); AR at 499–501, 503–05, 510 (Statements in Support of Plaintiff). The government also explained at oral argument there is no evidence in the record plaintiff requested to recess the hearings, explaining the only thing in the record concerning the length of the hearing was LtCol Acosta's letter explaining what occurred in his own words: "[t]he Senior Member made it clear that he was not inclined to continue [plaintiff's] case to a second day," plaintiff felt he "needed to rush while presenting evidence," and the lateness of the case "impacted [witnesses] ability to testify due to fatigue from . . . "having to stay up late" and "the fatigue in the room was noticeable." *See* AR at 438–39 (Letter from LtCol Acosta to the BCNR); *see also* Tr. at 106:6-17, 108:5–19. LtCol Acosta in his letter, however, made no mention of requesting a recess of the hearing, but explained the "Senior Member declined to deliberate that evening/early morning" and instead, "recessed the hearing until approximately 1200." AR at 439 (Letter from LtCol Acosta to the BCNR). The record therefore does not reflect there was a formal objection to the length of the hearing, weighing in favor of a finding that the BCNR correctly determined plaintiff had a fair hearing and its decision was neither arbitrary nor capricious. *See Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005) (explaining a court "will not disturb the decision of the corrections board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence" (citing *Haselrig v. United States*, 333 F.3d 1354, 1355 (Fed. Cir. 2003)); *see Carlborg v. United States*, 2024 WL 4675290 at *1 (Fed. Cir. 2024) (per curium) ("[W]e will not disturb the decision of the BCNR 'unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.'" (quoting *Chambers*, 417 F.3d at 1227)).

The Court next determines whether there is any evidence plaintiff was prevented from presenting before the BOI due to the length of the hearing. At oral argument, plaintiff explained core testimony at the BOI was taken late in the evening and there were multiple technical

difficulties. *See* Tr. at 112:16–113:6 ("[PLAINTIFF:] [Plaintiff was] required to call []
witnesses [] when it[ was] 11:00 o'clock P.M. their time and the audio quality [was] poor and
nobody [was] listening. And there's also statements from people who were witnesses at the BOI
who recall feeling like the board members weren't listening, that they weren't asked any
questions, that they were tired, that they felt rushed."). Plaintiff emphasizes one particular
witness waited over nine hours to be called and once called encountered multiple technical
difficulties resulting in the need to continually ask for questions to be repeated. *See* Tr. at
112:16–25, 117:16–118:8 (detailing plaintiff's complaints with the late-night proceedings and
the impact of technological issues on the presentation of witnesses). The government argues
plaintiff did not know what the audio volume was like for the witnesses and if there was a
problem then the witness could have raised audio quality as an issue at the time of testimony.
*See* Tr. at 117:16–118:8. Despite the technical difficulties and late presentation of the witness,
there is no evidence plaintiff was unable to present any evidence at the BOI hearing. Plaintiff
conceded this to be the case and could not identify any evidence he was unable to adequately
present or witnesses he was unable to call at the BOI due to the time constraints. *See* Tr. at
113:7–13 ("THE COURT: Can you point to any particular pieces of evidence that the plaintiff
could not adequately present due to the alleged improper time constraints? [PLAINTIFF]: I
don't know if there's specific pieces of evidence that were not presented in any manner.").

The BCNR found plaintiff "presented 19 witnesses before testifying himself for over an
hour" and was "not denied the opportunity to present any of his witnesses." AR at 359 (BCNR
Analysis of One Day Hearing). There were also "no objections made to any of [plaintiff's] 16
offered exhibits." AR at 359 (BCNR Analysis of One Day Hearing). Due to the number of
witnesses presented and exhibits offered, the BOI members "continued to hear testimony and
arguments until after midnight." AR at 359 (BCNR Analysis of One Day Hearing). In response
to plaintiff's argument about BOI members "tuning out testimony," the BCNR stated "[i]f, in
fact, the members tended to tune out the testimony of [plaintiff's] witnesses, that would reflect
his own tactical error in presenting so many unnecessary witnesses rather than any deprivation of
his rights." AR at 359 (BCNR Analysis of One Day Hearing). While it is not clear what "tuning
out testimony" means, the BCNR explains "[i]t is not unusual for BOI hearings to proceed late
into the evening, or even past midnight" and "the fact that a hearing encompassed nearly 16
hours of a day creates no concern for [the BCNR] whatsoever regarding the fairness of the
hearing, especially considering that there were significant breaks in the proceedings." AR at 359
(BCNR Analysis of One Day Hearing). The Court has no reason to doubt the BCNR's
explanation it is not unusual for BOI hearings to proceed late into the night. A long BOI that
lasts late into the night also does not prevent a "full and impartial hearing" as required by the
SECNAV. *See* SECNAV 1920.6D, encl. (11), ¶ 1. The BCNR also explained "the BOI
members spent the following morning deliberating over the evidence before reconvening to
announce those finding and recommendations that afternoon" and "[t]hose findings themselves
reflect that the BOI members paid careful attention to the evidence . . . ." AR at 359 (BCNR
Analysis of One Day Hearing). The amount of time the BOI members spent deliberating over
the evidence prior to announcing their findings or making a recommendation further supports the
BOI hearing was "full and impartial." *See* SECNAV 1920.6D, encl. (11), ¶ 1. The record
evidence is also sparse as to whether plaintiff was prejudiced by the late-night proceedings given
he was able to present all witnesses and evidence at the BOI. *See* Tr. at 113:7–13

- 32 -

("[PLAINTIFF]: I don't know if there's specific pieces of evidence that were not presented in any manner."); *see also* Tr. at 117:4–15 ("[GOVERNMENT:] There's just not enough on this record to . . . say the board members didn't do their job. I mean, ultimately what they did is hear a lot of testimony and they weighed it."). While the Court understands plaintiff's concerns with the late-night testimony and length of the one-day BOI proceedings, the Court agrees with the government's conclusion plaintiff was not prejudiced. Specifically, plaintiff could not point to any evidence he was unable to present at the BOI or that he was "denied the opportunity to present any of his witnesses." *See* AR at 359 (BCNR Analysis of One Day Hearing); *see generally* Pl.'s MJAR at 18–19; AR at 347 (BCNR Review of Plaintiff's Naval Record); AR at 428 (Plaintiff's Statement to the BCNR); AR at 438–39 (Letter from LtCol Acosta to the BCNR); AR at 499–501, 503–05, 510 (Statements in Support of Plaintiff); AR at 860–62 (0650 1 December 2020 Email from LtCol Acosta). The Court therefore agrees with the BCNR's finding plaintiff "was very clearly not subjected to any constraints in the presentation of his case." AR at 359 (BCNR Analysis of One Day Hearing). Plaintiff's self-admitted ability to present all witnesses and evidence at the BOI thus weighs in favor of a finding the BCNR correctly determined plaintiff had a fair hearing. *See Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005) (explaining a court "will not disturb the decision of the corrections board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence" (citing *Haselrig v. United States*, 333 F.3d 1354, 1355 (Fed. Cir. 2003)).

Given (1) plaintiff did not formally object to the length of the BOI hearing; (2) plaintiff was able to present all witnesses to the BOI; and (3) there is no specific evidence in the record to support plaintiff was prejudiced, the Court determines the BCNR's decision was supported by "substantial evidence" and was not "arbitrary [or] capricious" in finding the BOI did not deprive plaintiff of a fair hearing by conducting the hearing in one day. *Chambers*, 417 F.3d at 1227 (citing *Haselrig*, 333 F.3d at 1355)); *see also Carlborg*, 2024 WL 4675290 at *1 (per curium) ("[W]e will not disturb the decision of the BCNR 'unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.'" (quoting *Chambers*, 417 F.3d at 1227)).

## IX.    Whether the BCNR's Conclusion Plaintiff Was Not Deprived of Relevant Communications Was Arbitrary and Capricious

Plaintiff argues the BCNR's determination he was not deprived of relevant communications was arbitrary and capricious. *See* Pl.'s MJAR at 21. Plaintiff argues the CA did not provide him with all discoverable documents under the CA's "custody and control" and instead, the CA improperly found the request "overbroad and irrelevant." *See id.* at 22 (quoting AR at 834 (Decision on Plaintiff's BOI Discovery Request)). The government counters, arguing plaintiff could have, and should have, "requested the records through the Freedom of Information Act (FOIA) to further pursue his claims of bias, but merely suggesting that there may be such records is not enough to overcome the presumption of regularity." Gov't's Cross-MJAR at 24 (citing AR at 360 (BCNR Analysis of Discovery Requests)). Plaintiff's counsel requested "all writings [f]rom BGen Morris to RDML Weber related to [plaintiff]'s case; all writings from any Training Command staff member . . . to any Naval Medical Forces Pacific/Office of the Director, Medical Services Corps staff member (RDML Weber's command) about [plaintiff's] case; and all communications from any Navy or Marine Corp personnel to any BOI member regarding [plaintiff]'s case." AR at 446 (Plaintiff's BOI Discovery Request). "The CA provided one email chain between BGen Morris and RDML [Weber]" to plaintiff, but

"denied the latter request as 'overbroad and irrelevant,'" Pl.'s MJAR at 21 (citing AR at 834 (Decision on Plaintiff's Discovery Request)), as "the [CA] lacked custody and control of the materials," *see id.* (citing AR at 845 (1912 16 Dec. 2020 Email from LtCol Rico to CDR Davis) (explaining "request must be forwarded to the CA for action as she is the final authority")). Plaintiff agrees the SECNAV requires plaintiff to be given access to all material within the control and custody of the CA. *See* Tr. at 124:12–15 ("[THE COURT:] So the SECNAV requires that plaintiff be given access to all materials that are within the CA's control and custody, correct? [PLAINTIFF]: Yes, Your Honor."). Plaintiff also admitted the BCNR was correct in its determination the CA lacked control over some of the information held by some BOI members. *See* Tr. at 125:12–18 ("[THE COURT:] [W]as the BCNR correct that the convening authority did lack control over the requested material in the BOI members' possession? [PLAINTIFF]: That might have been true as to some of the information. THE COURT: But not for all of it. [PLAINTIFF]: Not for all of it, no."). Plaintiff, however, maintained the "requested writings between training command staff and the Navy Medical Forces Pacific, which was Rear Admiral Weber's command" were under the CA's custody and control because "the training command did respond with documents" and "that would have been within the [CA's] authority to have those documents." *See* Tr. 125:19–126:5. The BCNR found no merit in plaintiff's claim he was improperly deprived of relevant communications, finding:

> First, the materials that [plaintiff] claims to have been wrongfully denied were not within the custody and control of the convening authority. The convening authority did not have command authority over any of the BOI members in this case, so the BCNR is unaware how she could have compelled production of the requested material even if she was so required. Second, . . . the requested materials denied [] were not *relevant to the matters to be determined by the BOI*. Rather, these materials were request for the purpose of vetting a BOI member, which is not among the matters to be determined by the BOI.

AR at 360 (BCNR Analysis of Discovery Requests) (emphasis in original). Plaintiff argued the BCNR was incorrect in concluding the requested documents were not relevant because the "bias or not biased content of the information in any records goes to whether or not they should have been disclosed in the first place." *See* Tr. 126:6–22. The Court agrees the content of the requested document should not determine whether the documents are disclosed. The BCNR even acknowledged "the potential exits that such denial may constitute injustice if those records happen to reveal actual biases or disqualifying personal knowledge of [plaintiff's] case by the BOI member." AR at 360 (BCNR Analysis of Discovery Requests). Under the SECNAV, plaintiff is entitled "*full access*" to documents within the custody and control of the CA if the "records are relevant to the matters." *See* AR at 1331–32 (SECNAVINST 1920.6D, encl. (11), ¶ 7(d)). Yet, the BCNR maintained plaintiff "failed to provide any evidence that the requested records contain[ed] any such material" and "[w]hile the [BCNR] acknowledge[d] that [plaintiff] is unable to prove that these materials contain such matters without access to the records, that is his burden before [the BCNR] and [FOIA] provides a method for him to seek this information apart from a discovery request for materials to which he was not entitled." AR at 360 (BCNR Analysis of Discovery Requests). The SECNAV, however, states nothing about plaintiff bearing an exclusive burden to prove the content of the documents; rather, plaintiff must show the documents *relate* to the matter. *See generally* AR at 1331–32 (SECNAVINST 1920.6D, encl. (11), ¶ 7(d)). All the SECNAV requires is for the "records to be relevant to the matters" and

plaintiff shall then have "full access" to the documents. *See* AR at 1331–32 (SECNAVINST 1920.6D, encl. (11), ¶ 7(d)). Given the CA produced only one email chain between BGen Morris and RDML Weber, the CA should have also included the other communications and documents about plaintiff and his case later produced to the CA by the training command under RDML Weber's command given RDML Weber's numerous communications with others about plaintiff's case. *See* AR at 837–41 (Email Chain Involving RDML Weber and BGen Morris) (referencing text messages in emails). Any documents or communications produced by RDML Weber's training command referencing plaintiff or the case would therefore be relevant to the case and RDML Weber's personal knowledge. *See* AR at 1331–32 (SECNAVINST 1920.6D, encl. (11), ¶ 7(d)). It was therefore "arbitrary and capricious" for the BCNR to conclude plaintiff was properly deprived of the other documents produced by the training command as they would have been under the control and custody of the CA and related to the matter and "contrary to law" for the BCNR to place the burden on plaintiff to prove the requested documents contain actual bias or personal knowledge of plaintiff's case. *See* AR at 1331–32 (SECNAVINST 1920.6D, encl. (11), ¶ 7(d)) (requiring "[f]ull access to . . . records relevant to the matters to be determined by the BOI . . . that are within the custody and control of the convening authority"); *see also Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005) (citing *Haselrig v. United States*, 333 F.3d 1354, 1355 (Fed. Cir. 2003)); *Carlborg v. United States*, 2024 WL 4675290 at *1 (Fed. Cir. 2024) (per curium) ("[W]e will not disturb the decision of the BCNR 'unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.'" (quoting *Chambers*, 417 F.3d at 1227)).

As to plaintiff's request for all communications by any BOI member regarding plaintiff's case, the BOI denied this request as "overbroad and irrelevant," explaining plaintiff "could just voir dire members to ask them." *See* Tr. at 124:16–125:2; *see also* AR at 834 (Decision on Plaintiff's Discovery Requests). At oral argument, plaintiff said this was an "inaccurate statement" by the BOI because the communications are "relevant to the issues to be determined by the BOI, whether or not the BOI members are proper." Tr. at 125:2–4. According to plaintiff, "it's an injustice to deny a request saying the information can be solicited on voir dire but then say, well, you can't prove that Rear Admiral Weber lied because you don't have the underlying communications that may or may not have existed because we denied it as overbroad." Tr. at 125:4–10. Plaintiff did, however, concede the CA may have lacked control over some of the requested communication material in the BOI members' possession. *See* Tr. at 125:11–18 (noting plaintiff's agreement as to the CA's lack of control over "some of" the requested information "[b]ut not for all of it"). As explained *supra*, the BCNR said because the "convening authority did not have command authority over any of the BOI members in this case," the BCNR is "unaware of how she could have compelled production of the requested material even if she was so required." AR at 360 (BCNR Analysis of Discovery Requests). Yet, plaintiff maintains "denying access to communications with BOI members could constitute an injustice *if* those records reveal actual bias or disqualifying personal knowledge." Pl.'s MJAR at 22 (emphasis added).

At oral argument, the government explained it is unsure whether the CA could have ordered the BOI members to disclose communications about the case. *See* Tr. at 127:7–23 ("[THE COURT:] [D]oes the convening authority have the authority to order BOI members to disclose relevant communications? [GOVERNMENT]: I don't know the answer to that . . . . I think the BCNR . . . either said or implied [the CA] did not."). The government acknowledges

the question of whether the communications are discoverable comes down to a determination as to whether the communications were within the CA's "custody or control." *See* Tr. 127:13 ("[GOVERNMENT:] The question is whether it's in [the CA's] custody or control."). The government explained different jurisdictions require the application of different tests "concerning what it means to have something within your custody or control." Tr. 127:14–17. As for the BCNR's interpretation of custody and control as requiring the CA to have "custody" of the documents or "command authority over the BOI members" to "compel[] the production of the requested material," the government argues it was "literally these things were not in [the CA's] files or with [the CA's] command's files" and "that's not shown to be erroneous." Tr. 127:17–21. The government did, however, concede the CA could have at least asked the BOI members about the communications. *See* Tr. at 130:13–19 ("[GOVERNMENT:] Could the rear admiral have had asked? Sure, I assume she could.").

As SECNAVINST 1920.6D, encl. (11), ¶ 7(d), requires "[f]ull access to . . . records relevant to the matters to be determined by the BOI . . . that are within the custody and control of the convening authority," plaintiff was entitled to only the communications in the CA's custody and control, which not only included the communications between BGen Morris and RDML Weber, but also any other communications the CA possessed. *See* AR at 1331–32 (SECNAVINST 1920.6D, encl. (11), ¶ 7(d)).[5] Plaintiff's communications request is therefore

---

[5] Both parties agree no Federal Circuit or Court of Federal Claims cases review the scope of discovery under SECNAVINST 1920.6D, encl. (11), ¶ 7(d). *See generally* Tr. 124:7–132:20 (detailing discussion regarding deprivation of discovery). Plaintiff, however, cited an applicable district court case, *Brezler v. Mills*, 220 F. Supp. 3d 303 (E.D.N.Y. 2016), which reviews a Navy BOI discovery decision, cites a variety of US Court of Appeals cases, and provides helpful analysis which the Court finds persuasive. *See generally* Pl.'s MJAR at 21–22. The *Brezler* court found the "government's determination that the documents sought by plaintiff 'were not relevant, did not exist, or within the control of the Marine Forces Reserve' to be completely unsupported by the administrative record" as "nothing in the administrative record provides any reasonable basis for the Navy's sweeping conclusion that all of these documents were immaterial." *Id.* at 327–28 (internal citations omitted). Similar to *Brezler*, the administrative record in this case does not support a reasonable basis to conclude plaintiff's discovery request was not "relevant" to matters to be determined by the BOI. While the Court notes the BCNR here found *Brezler* inapplicable because it analyzed a different SECNAVINST, *see* AR at 391 (OLC Advisory Opinion); *see also* AR at 360 (BCNR Analysis of Discovery Requests), the holding in *Brezler* is instructive to the issue regarding the production of relevant documents and/or communications and supports the Navy must comply with its own rules. Here, the government asks the Court to find plaintiff was properly deprived of discovery by accepting the Navy's reading of SECNAVINST 1920.6D, encl. 11, ¶ 7(d) as only allowing the discovery of records "relevant to the matters to be determined by the BOI." *See* AR at 360 (BCNR Analysis of Discovery Requests). The Navy found the requested discovery by plaintiff was not relevant to the BOI matters because "[i]t does not appear that these emails were germane to the actual allegations" before the BOI. *See* AR at 389 (OLC Advisory Opinion). The CA, however, already determined communications about plaintiff's case prior to the BOI were relevant when she produced the email chain containing communications between RDML Weber and BGen Morris. *See* AR at 837–41 (Emails Involving RDML Weber and BGen Morris). Those emails raise suspicion as to whether there were further communications about plaintiff's case and any similar communications would also be relevant to the case—especially given the importance of communications already produced. *See supra*. It is also the duty of the CA to determine whether BOI members challenged for cause can properly consider a case. *See* SECNAVINST 1920.6D, encl. (11), ¶ 7(f). All communications relating to plaintiff or his case prior to the BOI are therefore relevant to the BOI and whether the BOI members were proper. As such, following the reasoning in *Brezler*, the Court "refuse[s] to adopt the Navy's cramped reading of a rule," *Brezler*, 220 F. Supp. 3d at 327 (citing *Blassingame v. Sec'y of the Navy*, 866 F.2d 556, 560 (2d Cir. 1989)), specifically, the BCNR's interpretation of SECNAVINST 1920.6D, encl. 11, ¶ 7(d) which requires "[f]ull access to . . . records relevant to the matters to be determined by the BOI . . . that are within the custody and control of the convening authority." *See Brezler*, 220 F. Supp. 3d at 326 ("The Navy, like any other agency, must comply with its own binding rules.") (citing *Smith v. Resor*, 406 F.2d 141, 145 (2d Cir.

not overbroad or irrelevant.  The BCNR should confirm:  (1) if there are any additional documents and/or communications regarding plaintiff's case that were gathered by the CA or should have been provided to the CA within her command, and, if so, (2) whether these documents are relevant to plaintiff's case.  *See* Tr. at 128:4–11 ("[GOVERNMENT:]  So much was supplied to all [BOI] members . . . in the[] binders . . . that it's unlikely there would have been anything else, but [plaintiff] certainly could have asked.").  Additionally, given plaintiff was supplied with *some* emails concerning communications about his case, there is now indication of further communications concerning plaintiff's case; plaintiff is entitled to such documents if they exist.  *See* Tr. at 39:23–22 (detailing the government's explanation there were seven emails supplied to plaintiff and in the administrative record); *see also* AR at 837–41.  As the BCNR "acknowledges that the potential exists that [] denial [of discovery] may constitute an injustice if those records happen to reveal actual biases or disqualifying person knowledge of [plaintiff's] case by the BOI members" and further "acknowledges that [plaintiff] is unable to prove that these [requested] materials contain such matters without access to the records," AR at 360 (BCNR Analysis of Discovery Requests), the BCNR—by its own admission—was arbitrary and capricious in determining plaintiff should not have had *full access* to the communications under the custody and control of the CA, *see* SECNAVINST 1920.6D, encl. (11), ¶ 7(d) (requiring "[f]ull access to . . . records relevant to the matters to be determined by the BOI . . . that are within the custody and control of the convening authority"); *see also Chambers*, 417 F.3d at 1227 (citing *Haselrig*, 333 F.3d at 1355)); *Carlborg*, 2024 WL 4675290 at *1 (per curium) ("[W]e will not disturb the decision of the BCNR 'unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.'" (quoting *Chambers*, 417 F.3d at 1227))).

## X.    Whether the BCNR Arbitrarily and Capriciously Found No Material Error in the Admission of Certain Evidence

Plaintiff contends the BCNR acted arbitrarily and capriciously in its determination there was no material error in the BOI allowing the full investigative report to be admitted into evidence.  Specifically, plaintiff argues the prior allegations of his alleged misconduct were not relevant and was not proper evidence to be considered by the BOI.  *See* Tr. 161:22–162:12 ("[THE COURT:]  [S]pecifically what evidence is plaintiff arguing was wrongfully admitted?  [PLAINTIFF]:  Well, I mean, the entire command investigation, which includes all of these allegations that were made . . . and the BCNR said that this was all relevant to BOI members deciding whether or not there was a toxic command climate.  So they were given all of these allegations, even the ones that were unsubstantiated, and BCNR said that was relevant.  And then the legal advisor overruled [plaintiff's] counsel's objection to evidence saying that, you know, allegations that he committed, other violations or bad acts [are] relevant to whether he conformed to the prescribed standards of military deportment.").  Plaintiff, however, admitted there was no caselaw indicating the BOI's use of the allegations and associated statements as evidence was impermissible during a BOI proceeding.  *See* Tr. at 163:6–18 ("THE COURT: And is there any case to support that this is a direct violation of the SECNAV that I read from?

---

1969)); *id.* at 327 (explaining the government's decision to not disclose documents "'imposed a requirement not present in its regulation' and is plainly at odds with the rule's wide ranging ambit, which encompasses all relevant information" (quoting *Kreis v. Sec'y of the Air Force*, 406 F.3d 684, 686 (D.C. Cir. 2005)); *id.* ("It is axiomatic that an agency decision is 'arbitrary and capricious' if it is contrary to the agency's own mandatory rules.") (citations omitted)).

[PLAINTIFF]:  I do not have any cases to provide, no, Your Honor.  THE COURT:  Or understanding of . . . how this relates?  [PLAINTIFF]:  No, I don't have any cases to cite to on that.").  Under the SECNAV, evidence "may be subject to reasonable restrictions . . . . as determined by the Legal Advisor."  *See* AR at 1322 (SECNAVINST 1920.6D, encl. (11), ¶ 12(c)).  Given the SECNAV regulation is broad as to what is proper evidence, and the Legal Advisor determined the full investigative report was relevant, the admission of the full investigation report was not improper.  *See id.*  The BCNR therefore was not arbitrary and capricious in determining there was no material error in admitting the full investigative report.  *See id.* (explaining evidence "may be subject to reasonable restrictions . . . . as determined by the Legal Advisor."); *see also Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005) (citing *Haselrig v. United States*, 333 F.3d 1354, 1355 (Fed. Cir. 2003)); *Carlborg v. United States*, 2024 WL 4675290 at *1 (Fed. Cir. 2024) (per curium) ("[W]e will not disturb the decision of the BCNR 'unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.'" (quoting *Chambers*, 417 F.3d at 1227)).

## XI.    Whether the BCNR Arbitrarily and Capriciously Rejected Plaintiff's Claim of Error and Injustice in the Flawed Command Investigation

Plaintiff argues the command investigation was flawed and the BCNR was arbitrary and capricious in rejecting plaintiff's claims the investigation into his conduct was both impartial and not thorough.  Plaintiff argues under Marine Corps Order 5354.1E, commanders are "responsible for ensuring a prompt, impartial, and thorough investigation of all complaints alleging prima facia prohibited activities and conduct."  Pl.'s MJAR at 33 (citing MCO 5354.1E, ¶ 406).  Specifically, plaintiff alleges the investigation was flawed because "the investigator just interviewed the people who had filed complaints against [plaintiff] and were identified by the complaining witnesses."  Tr. 136:25–164:10.  Plaintiff further asserts no one "with knowledge of the incidents, who would have had an unbiased and relevant knowledge, was questioned."  Pl.'s MJAR at 39.  Plaintiff reasons the investigation was not impartial because plaintiff was only asked about one specific alleged incident, with the remainder of the interview consisting of broad, open-ended questions."  *See* AR at 760–66 (CO Response to Command Investigation); *see* Tr. at 164:11–165:1 ("[PLAINTIFF:]  If you look at the questions that [plaintiff] was asked . . . he was asked broad, open-ended questions . . . . [H]e was charged with supposedly supplying alcohol from his personal supply at a Navy Ball, for example.  And the only thing he was asked was, explain your personal relationship with subordinate staff . . . . he was not asked about any of the specific incidents, so there was no fact finding.  And when you [] couple [that] with the fact that the legal advisor and the BCNR found it appropriate to give this entire investigation [with] all the supposed facts it contains to the BOI members for their use in deciding the charges against him, [and] the fact that it's a one-sided recitation of facts . . . are big consequences for [plaintiff].").  Plaintiff, however, does not cite any case law to support its position and only relies on the Marine Corps Order.  *See* Pl.'s MJAR at 33.  Instructively, Marine Corps Order 5354.1E only sets forth a requirement for the investigation be "prompt, impartial, and thorough[.]"  *See* MCO 5354.1E, ¶ 406.  This requirement is broad enough to permit the commander tasked with investigating the allegations to craft the investigation in a manner the commander deems proper for the specific allegations.  *See generally id.*  The investigator interviewed all relevant witnesses who possessed information regarding the investigation and also questioned plaintiff about the allegations.  *See* AR at 760–68 (CO Response to Command Investigation).  As a result, the investigator was thorough in the investigation of the complaints

as required by the Marine Corps Order. *See* MCO 5354.1E, ¶ 406. The BCNR therefore properly rejected plaintiff's claim that the investigation was flawed and its determination was not "arbitrary, capricious, [or] contrary to law" as the investigation did not cause plaintiff error or injustice. *See Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005) (citing *Haselrig v. United States*, 333 F.3d 1354, 1355 (Fed. Cir. 2003)); *see also Carlborg v. United States*, 2024 WL 4675290 at *1 (Fed. Cir. 2024) (per curium) ("[W]e will not disturb the decision of the BCNR 'unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.'" (quoting *Chambers*, 417 F.3d at 1227)).

## XII. Whether the BCNR Arbitrarily and Capriciously Decided the BOI's Recommendation Regarding Retirement Grade Was Appropriate

Plaintiff argues it was arbitrary and capricious for the BOI to determine plaintiff should retire at a lower paygrade of O-5 as opposed to an O-6. *See* Pl.'s MJAR at 28–30. Specifically plaintiff argued: (1) BOI members had to recommend the "highest grade in which the officer served satisfactorily for a period of not less than six months in accordance with the guidelines contained in enclosure [9]" and the BOI members were not provided with such guidelines; (2) "[t]he fact that the BOI members recommended the grade urged by the Recorder in no way illustrates that they appropriately considered the Guidelines on Recommendations or based their recommendation on such guidelines, as required;" (3) the "BCNR's conclusion that the BOI member's recommendation is essentially irrelevant because SECNAV made the final decision is likewise arbitrary and capricious;" and (4) "[e]ven more problematic . . . is the Deputy Chief's reliance upon unsubstantiated allegations as evidence of misconduct warranting detachment for cause and reduction in rank at retirement." *Id.* At oral argument, however, plaintiff admitted his "time in service" during the pendency of the investigation into him could not be deemed "satisfactory" if the investigation and BOI was proper. *See* Tr. at 158:22–159:8 ("[THE COURT:] I guess it can't be that during the time of the investigation that one receive proper credit for [satisfactory time served in grade] if the investigation is proper. I mean, you would agree the petitioner's service in the grade of captain during that time period could not be considered satisfactory if the BOI was considered satisfactory? [PLAINTIFF: I don't know that it couldn't be, but most likely wouldn't be. THE COURT: So this all hinges upon the BOI processes and procedures being correct or not correct? [PLAINTIFF]: Yes, Your Honor."). As plaintiff conceded this claim is related to his overarching claim of an improper BOI, the Court finds this argument regarding plaintiff's proper retirement grade moot as its own separate issue.

## XIII. Conclusion Regarding Whether the BCNR's Review of the BOI Was Arbitrary and Capricious, Contrary to Law, or Not Supported by Substantial Evidence

With respect to plaintiff's requested relief, the Tucker Act instructs: "To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing . . . placement in appropriate duty or retirement status, and correction of applicable records . . . ." 28 U.S.C. § 1491(a)(2). The Court also holds authority "to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just." *Id.*

As explained *supra*, the Court determines the following regarding the BCNR's decision:

1. The record reflects there is substantial evidence to support RDML Weber possessed substantive personal knowledge; the BCNR's determination to not correct the BOI's finding RDML Weber was properly on the BOI was "arbitrary, capricious, contrary to law, and unsupported by evidence." *See supra* Section V.A.

2. The BCNR's decision to ignore RDML Weber's substantive personal knowledge, apply the harmless error rule despite RDML Weber's inclusion on the BOI being unquantifiable, and ignore the OLC's finding of personal knowledge was "arbitrary, capricious, contrary to law, and unsupported by evidence." *See supra* Section V.B.

3. The BCNR's finding of no UCI because all the members of the BOI and CA were all flag officers of the same rank was not "arbitrary, capricious, contrary to law, or unsupported by substantial evidence." *See supra* Section VI.B.

4. As the record supports plaintiff was aware of the specific allegations against him and was provided an opportunity to respond to the allegations, the BCNR properly determined plaintiff was given proper notice. *See supra* Section VII.

5. The BCNR Was not arbitrary and capricious in determining the BOI did not deprive plaintiff of a full and fair hearing by conducting the proceedings in one day. *See supra* Section VIII.

6. It was "arbitrary, capricious, contrary to law, and unsupported by substantial evidence" for the BCNR to conclude plaintiff was properly deprived of additional communications and documents in control and custody of the CA and relevant to the BOI. *See supra* Section IX.

7. The BCNR's decision finding no material error in the admission of evidence was not "arbitrary, capricious, contrary to law, or unsupported by substantial evidence." *See supra* Section X.

8. The BCNR was not arbitrary and capricious in determining the Command Investigation was not flawed. *See supra* Section XI.

9. Plaintiff's argument regarding plaintiff's proper retirement grade is moot. *See supra* Section XII.

As detailed *supra*, the Court has determined the BCNR's decision was arbitrary and capricious and accordingly remands the case to the BCNR to re-evaluate these decisions. As discussed at oral argument, the Court will offer the parties opportunity to meet and confer to determine the specific remand instructions as to what should be reconsidered on remand. *See* Tr. at 165:2–168:22 (detailing the parties' agreement it would be best to meet and confer and submit a joint status report ("JSR") detailing draft remand instructions). The parties **SHALL** meet and confer to determine the appropriate remand instructions and **SHALL FILE** a JSR **on or before 18 February** proposing draft remand instructions to the Court. As discussed at oral argument,

the parties should reference the Court's remand instructions in *Stahl v. United States*, 167 Fed. Cl. 657 (Oct. 10, 2023), in providing the Court with draft remand instructions.

## XIV.  Conclusion

For the foregoing reasons, the Court:  (1) **GRANTS-IN-PART**, **DENIES-IN-PART**, and finds as **MOOT-IN-PART** plaintiff's Motion for Judgment on the Administrative Record, ECF No. 9; and (2) **GRANTS-IN-PART** and **DENIES-IN-PART** the government's Cross-Motion for Judgment on the Administrative Record, ECF No. 11.

**IT IS SO ORDERED**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge